STATE of Tennessee, Appellee,

v.

Jane FORBES and Richard
Canady, Appellants.

Court of Criminal Appeals of Tennessee,
at Nashville.

Dec. 19, 1995.

David L. Raybin, John J. Hollins, Sr., Nashville, for Appellant Forbes.

Terry J. Canady, Nashville, Steven Glaser, Gallatin, for Appellant Canady.

Charles W. Burson, Attorney General and Reporter, Eugene J. Honea, Assistant Attorney General, Nashville, Joseph D. Baugh, Jr., District Attorney General, Ronald L. Davis, Donald Schwendimann, Asst. District Attorneys General, Franklin, for the Appellee.

## OPINION

BARKER, Judge.

The appellants, Jane Forbes and Richard Canady, appeal from judgments of conviction entered in Hickman County Circuit Court. Forbes was convicted of fabricating evidence in violation of Tennessee Code Annotated section 39–16–503(a)(2), a class C felony, and she was sentenced to three years of probation, two hundred hours of community service, and a $5,000 fine.[1] Canady was convicted of aggravated perjury in violation of Tennessee Code Annotated section 39–16–703(a), a class D felony, and he was sen-

tenced to two years of probation and one hundred hours of community service.

Forbes presents numerous issues for our review, which we summarize as follows:

(1) whether the evidence was sufficient to support the jury's verdict of guilty;

(2) whether the judgment of conviction was a nullity because the offense of "fabricating evidence" does not exist under Tennessee law;

(3) whether the trial court's instructions to the jury permitted a non-unanimous verdict in violation of the United States and Tennessee Constitutions;

(4) whether the trial court correctly defined the elements of the offense in its charge to the jury;

(5) whether Tennessee Code Annotated section 39–16–503 was unconstitutionally vague and overbroad as applied in this case;

(6) whether the trial court erred in instructing the jury with regard to criminal responsibility;

(7) whether the trial court erred in failing to instruct the jury that attempt was a lesser included offense;

(8) whether the trial court erred in excluding evidence offered to show the appellant's state of mind;

(9) whether the trial court erred in excluding evidence offered to impeach a state witness;

(10) whether the trial court erred in failing to excuse a juror during the trial; and

(11) whether the trial court erred in reading portions of the jury charge in response to a question asked during its deliberations.

Canady raises issues (1), (10), and (11). We conclude that reversible error was committed in the trial of Forbes; her conviction is reversed and the case is remanded for a new trial. We further conclude that the evidence was legally insufficient to support the jury's verdict of guilt with respect to Canady; his judgment of conviction is reversed and the case against him is dismissed.

---

1. Forbes was also convicted of conspiracy to fabricate evidence, but the trial court granted a judgment of acquittal on this charge post-trial.

In April and May of 1992, two lawsuits were filed in Hickman County, Tennessee, which sought the removal from office of then County Executive James Coates. The first suit was filed pursuant to a private act governing Hickman County; the second suit was filed pursuant to Tennessee statutes regarding ouster of public officials.[2] Both lawsuits alleged numerous financial improprieties and mismanagement on the part of Coates as County Executive. Coates retained Jane Forbes, an attorney, to defend him against the lawsuits. Although the civil suits against Coates were ultimately dismissed upon his resignation from office, the criminal charges against Forbes and Canady emerged from the litigation of the civil proceedings.[3]

Floyd Jerry Yates was elected to the Hickman County Commission in August of 1990, defeating the incumbent, Richard Canady. As chair of the budget committee for fiscal year 1991, he reviewed monthly reports of the county's general fund, which was managed by James Coates. The fund was in a "pretty sad state" as many items were over budget. Yates discussed the matter with Coates in March of 1991. Coates did not believe the matter was serious but agreed that Yates should report to the commission, which Yates did in April of 1991.

Yates continued to monitor what he thought was "a deficit problem" and a "very serious tax flow problem." He was concerned that the county would be unable to meet its payroll.[4] In July of 1991, Yates noticed that seven checks were issued from the general fund by Coates, including one payable to Centerville Tire and Auto for $351.15. Yates confirmed the information with Rhonda Gossett, Coates' bookkeeper, and then confronted Coates. Yates told Coates that he was eligible for mileage reimbursement but not repair expenses. Coates later reimbursed the county for the money.

Yates discussed the budget problems with County Commissioner Steven Gregory.[5] He and Gregory reviewed numerous financial records, checks, and travel documents relating to Coates. Gregory eventually called the State of Tennessee's Division of County Audit for assistance; the auditors determined that the county had a deficit of $234,000 at the end of fiscal year 1991.

Yates and Gregory discussed the matter with Douglas Thompson Bates, III, an attorney who represented Hickman County on various matters from 1982 to 1986. Bates had learned of the county's budget problems in the summer of 1991. He read in the newspaper that Coates had been reimbursed for car repairs and expenses, which he believed to be "obviously illegal." He learned that there was an "enormous deficit" in the general fund that a state auditor later determined to be over $200,000. Bates obtained copies of the county audits, and he concluded that the "desperate situation" was due to Coates' mismanagement of the general fund.

Bates filed two lawsuits against Coates on behalf of certain citizens and commissioners in Hickman County. The first suit, pursuant to a Tennessee Private Act governing Hickman County, sought Coates' removal from office and a monetary judgment of $230,830. The second suit, in which Bates himself was one of the named plaintiffs, sought Coates' ouster from office pursuant to Tennessee statutory law.[6] Bates agreed to "donate" his time to litigate both suits in return for one third of any monetary judgment. It was agreed, however, that the plaintiffs in the private act lawsuit would waive any right to a monetary judgment if Coates resigned from office.

In preparation for the ouster trial, Bates, Yates, and Gregory reviewed checks written from the general fund for fiscal years 1989–

---

2. *See* Tenn.Code Ann. § 8–7–101, et. seq. The ouster suit was voluntarily dismissed and later refiled.

3. Coates was indicted with Forbes and Canady, but he was tried separately.

4. In fact, funds eventually had to be borrowed from other areas of the budget to avert a crisis.

5. Gregory was elected County Executive in November of 1992, two months after Coates resigned.

6. Yates and Gregory were also among the plaintiffs in the second ouster proceeding, which was filed after the voluntary dismissal of the first ouster lawsuit.

90, 1990–91, and 1991–92. They reviewed Coates' travel records for these years, documenting the dates of travel and the reimbursement amounts. Bates determined that many of the travel records lacked verification or supporting documents, and that many of the reimbursement amounts had been rounded up to exact dollar figures. Further investigation revealed occasions in which Coates had apparently been reimbursed for travel expenses not only by Hickman County but also by the South Central Human Resources Agency and the South Central Tennessee Development District. Bates asked Coates about these "double dipping" incidents in his deposition on July 30, 1992.[7]

The ouster trial was scheduled to begin on August 26, 1992 (it was later continued). Pursuant to a local rule of court, the parties were to exchange lists of proposed exhibits by August 21, 1992. On that day, Bates received a fax entitled "Defendant's Exhibit List." He reviewed the list for items he wished to inspect, including what was noted as "the defendant's calendars for the years 1990, 1991, and 1992." Forbes advised him that the calendars would be made available for inspection the next day, August 22nd, in Coates' office. Bates arrived with Yates and Gregory, and they photocopied records and documents in the presence of Canady and C.W. McCaleb. Neither Forbes nor Coates were present. At one point, Bates opened one of the calendars and said, "Look here." Canady tried to see what Bates was referring to but Bates closed the calendar. Bates conceded that it was merely a "ploy" to gauge Canady's reaction.[8]

Bates was concerned that the calendars were "powerful" evidence because they could corroborate Coates' travel on days for which there were no other supporting documents. He asked Canady about them in a deposition on August 26, 1992. Canady, who was under oath, admitted that he provided "calendars or checkbooks" to Bates in Coates' office on August 22nd. He also admitted that he had obtained calendars for 1988 to 1991 from H & L Printing two to four weeks earlier. He claimed that he needed the calendars because he was being audited by the Internal Revenue Service. He denied knowing whether Forbes told Coates that they needed to obtain old calendars.

Forbes was present at the deposition but did not ask any questions of Canady. On August 28, 1992, she sent a letter to Bates which said:

> As a clarification and to avoid any misunderstanding . . . this is to advise you that Mr. Coates's calendars for the years 1990 and 1991 were reconstructed from the exhibits to depositions or trial, the records from South Central Tennessee Development District, South Central Human Resource Agency, other exhibits, Mr. Coates's memory, and other notes he may have had. Mr. Coates's has [sic] maintained his calendar from 1992 on a reasonably contemporaneous basis.

Bates reviewed the calendars to determine whether they appeared to be reconstructions. He noticed different color ink had been used in both the 1990 and 1991 calendars, often on the same pages. He also noticed entries pertaining to office meetings and telephone calls, which did not seem to relate to a mere reconstruction of travel events.

On cross examination, Bates discussed the reasons for filing multiple lawsuits against Coates. The private act suit sought Coates' removal from office and his repayment of money owed to the county. Bates also believed that the suit would pressure Coates into resigning to avoid payment of a monetary judgment. The initial ouster suit was filed in May of 1992 by ten citizens of Hickman County. It was dismissed, and a second ouster suit filed, when some of the plaintiffs were "scared off" the case. Bates claimed that he did not file the suits for monetary reasons, and that his failure to recover a fee or discretionary costs did not make him angry.

---

7. There was extensive testimony and documentary evidence relative to the allegations of Coates' financial improprieties. The particulars are not material to our recitation of the facts in this opinion.

8. Bates, Yates, and Gregory all testified as to this incident; however, C.W. McCaleb testified in Canady's defense that he had no memory of it.

Bates admitted that he contacted the District Attorney General's office with regard to the ouster proceedings as early as the winter of 1991, and that he later asked for an assistant district attorney general to help with depositions. On August 19, 1992, (seven days before the ouster trial was to begin), he met with the District Attorney in Bates' office. The District Attorney mentioned the possibility of allowing Coates to plead guilty to a misdemeanor and resign from office. Bates replied that "we would not have a problem with that." He clarified that he did not know of the District Attorney's plea offer before it was made to Coates, and he denied using the threat of criminal charges to facilitate settlement of the civil cases.

Bates' testimony indicated that relations between him and Forbes were strained at best. He admitted supporting Judge Henry Denmark Bell over Forbes in an election for circuit court judge in 1990. He told a Forbes' supporter at the time that Forbes was "picking on an old man," and that he would do whatever was "honorably necessary to see that Judge Bell remains." He also acknowledged an incident during depositions in which he raised his voice at Forbes stating, "You have no dog in this hunt." He denied yelling at Forbes, but admitted he may have raised his voice; he denied standing up as he spoke, but admitted he may have been red in the face.[9] Bates also testified that in July of 1992, Forbes certified that a copy of a motion for summary judgment had been served upon Bates. Bates was not served, however, because he was on vacation at the time, a fact he had advised Forbes of before the motion was filed. Bates found such "dishonesty among lawyers" to be "upsetting."

Similarly, Bates testified that James Coates filed a complaint against him with the Tennessee Board of Professional Responsibility in May of 1992. The complaint, in effect, alleged that the lawsuits had been filed to harass Coates for political reasons and were based on insufficient investigation. Bates called the complaint "frivolous" and "mean spirited" and said that it had been dismissed.[10] After the complaint was filed against him, Bates sent a letter to Forbes stating that he would not be "scared off" the case. Bates denied that the incident made him angry, and he denied that he and Coates were "political enemies." [11]

Finally, Bates acknowledged that he refused to speak to Forbes' counsel before the criminal trial. He claimed that counsel, Mr. Raybin, made "unethical" comments by telling the media that the criminal charges were the result of Bates' personal vendetta. Thus, in a letter to Mr. Raybin dated May 25, 1993, Bates responded:

> Your dishonest and unethical public comments in regard to this case cause me to believe that you are not interested in interviewing me for purposes of representing your client in court and bringing out the truth. Since you have other motives, I do not wish to accommodate them.

However, Bates denied telling Rhonda Gossett, Coates' former bookkeeper, not to talk to Mr. Raybin.

Renee Hill testified that she worked at H & L Printing in Centerville. In August of 1992, she could not recall precisely when, Richard Canady came to the shop and requested calendars for previous years. Hill's employer told her to locate such calendars, which she did. She recognized the calendars because the 1991 calendar had Hill's own birthday noted therein, in her own handwriting.

Gerald Neenan was co-counsel for James Coates. While preparing for trial, he and Forbes had difficulty getting Coates to review the necessary documents and records. Neenan told Coates that he needed to explain every check he had received and to

---

9. Donna Bufurd was the court reporter at the deposition. She testified that the atmosphere was tense and that Bates was "agitated and upset." His voice was "higher than normal" when he spoke to Forbes, and he placed his hands on the table and stood.

10. Mary Woodruff, executive secretary with the Board of Professional Responsibility, testified that the complaint was administratively dismissed on September 9, 1992.

11. Robert Bowman, a witness in the State's case, testified that Bates and Coates were in fact "political enemies."

account for his time and travel. He and Forbes urged Coates to assist in preparing the case for trial. Because of Neenan's frustration with Coates, Forbes began to handle the majority of direct contact and preparation with Coates.

Neenan wanted to prepare a single exhibit that would explain all of Coates' information pertaining to dates, travel, mileage, and reimbursement amounts. Coates' participation was critical to prepare such an exhibit. In May or June of 1992, Neenan examined Coates' calendar for 1992, but its contents were sketchy and not very useful. He asked Coates about calendars for earlier years but Coates said they were no more useful than the 1992 calendar.

On August 21, 1992, the deadline for filing the list of proposed exhibits, Neenan exchanged a number of fax messages with Forbes. At 7:14 a.m., Forbes sent a fax to Neenan listing eleven items to be added to the exhibit list, none of which mentioned calendars. At 8:58 a.m., Neenan received a fax from Forbes that said, "Please add Mr. Coates' calendar to exhibit list." Neenan did not know what calendar Forbes was referring to but he added to the list, "The defendant's calendars for the years_____." Based upon his notes and a subsequent conversation with Forbes, Neenan wrote the years 1990, 1991, and 1992 in the blank space; thus, the final list that was sent to Bates and filed with the court said, "The defendant's calendars for the years 1990, 1991, and 1992."

Neenan testified that he received a settlement offer from Bates on August 17, 1992, following the deposition of the state auditors. He wrote a lengthy letter to Coates on August 19th advising him that there was "a substantial basis" for the ouster. On August 21st, in the midst of the hectic last minute preparations, Neenan received a telephone call "out of the blue" from the District Attorney, who offered to let Coates plead guilty to a misdemeanor offense in return for six months probation and restitution. Following a conference call with Forbes and Coates, it was decided that a criminal defense lawyer would be contacted. Neenan found it unusual to get a call from the District Attorney, particularly since Coates had yet to be charged with any type of criminal offense. The District Attorney's offer, coming as it did shortly after Bates' offer and shortly before the start of trial, made Neenan "real suspicious of the timing," as it is unethical to use the threat of criminal prosecution to facilitate the settlement of a civil proceeding.

On August 26, 1992, following the deposition of Richard Canady, Forbes told Neenan that Bates was confused because he did not know the calendars were reconstructions. Neenan responded that he too did not know the calendars were reconstructions, and that there had never been any discussions to that effect. He advised Forbes to write a letter of explanation to Bates.

Rhonda Gossett worked as Coates' bookkeeper from April of 1990 to August of 1992. She was hired and trained by James Coates. In June of 1991, he instructed her (or possibly a coworker) to write a check to Centerville Tire and Auto for $351. Coates instructed Gossett as to how to "code" the entry, and he took the check.

From May to August of 1992, Gossett helped Coates review the checks written from the general fund and his travel records. She attended four or five meetings in Forbes' office, including one in late July or early August with Forbes, Coates, and Gerald Neenan. Either Forbes or Neenan asked Coates whether he had calendars for prior years. Coates said he had thrown them away. When Neenan left the room, Forbes said to Coates, "I wish you hadn't said that. We really need those calendars for prior years. Do you think you could come up with any?" Coates said he thought he could. When Neenan returned, Forbes gestured for Coates to be quiet by "shushing" him.

Gossett said that Canady did not attend the meetings in Forbes' office. However, on August 19, 1992, she was approached by Canady in Coates' office. Canady told her that she "better take the blame" for the check written to Centerville Tire and Auto. He told her that Coates would be ousted from office whereas she would always have a job. He also said he would tell others she

lied if she repeated their conversation.[12] The encounter was upsetting to Gossett. Her deposition was to be taken the next day, but she felt that she could not go through with it because of the stress. She told Forbes who replied, "That's just too bad, isn't it?"

On August 24, 1992, Gossett quit her job. She called Douglas Bates because she was afraid he would think she was "up to something" or avoiding the deposition. She told Bates about the meeting at Forbes' office when calendars were discussed. Bates prepared an affidavit based on their conversation. Gossett reviewed it and signed it on October 26, 1992. Gossett acknowledged that the affidavit did not mention Forbes' statement, "I wish you hadn't said that." It also omitted any reference to her gesturing for Coates to be quiet.[13] Gossett admitted that Bates helped her obtain counsel who filed a motion requesting that her deposition be videotaped at the courthouse. Neither Bates nor the lawyer charged Gossett for their services.

Joe Gilbert testified on behalf of Forbes. In 1990, he went to Douglas Bates' office to ask for his support in Forbes' campaign for circuit court judge. Bates told him that Forbes was "picking on an old man," and he said, "Jane Forbes running against Judge Bell is not absurd, that's too kind a word; it's disgusting." Bates raised his voice, leaned forward and pointed his finger at Gilbert as he spoke. Bates told Gilbert that if he intended to practice law or politics in the area, "we have a long memory here." Gilbert, who was twenty years old at the time, was "scared to death" by Bates' comments and actions.[14]

Patricia Henegar testified that she worked as Forbes' legal assistant and secretary. Pursuant to Forbes' request, she reviewed the county checks and Coates' travel records, and she made a list of six trips that were potential duplicates. Coates explained five of them and then told her that he would check the date of the sixth trip in his calendar. Henegar made a list of the trips and noted that the date of the sixth trip was "written down in [Coates'] calendar." She arrived at the office at 8:00 a.m. on August 21st and presented the information to Forbes, whom she described as "tired and stressed." Coates arrived between 10:00 and 10:30 a.m., and Henegar saw him working in the conference room, reviewing the records and writing in his calendar. She informed Forbes. Later in the day, discussion turned to the District Attorney's plea offer. The office was "totally disrupted" and Forbes was "very distraught."

Jane Forbes testified that she began practicing law in 1979. In 1982, she was appointed bankruptcy trustee, which soon comprised seventy to seventy-five per cent of her practice. In 1985, she met Gerald Neenan and worked with him in several cases in which she needed an established trial lawyer. In 1990, she lost a close election for circuit court judge against Judge Henry Denmark Bell. She was unaware of Douglas Bates' animosity toward her prior to his negative comments to Joe Gilbert. The hostility throughout the litigation of the ouster suits increased to where she feared Bates. Forbes' husband eventually volunteered to attend depositions with her due to the increased hostility.

Forbes and Gerald Neenan agreed to represent Coates after Bates filed the initial lawsuit. Forbes denied preparing any calendars on behalf of Coates, and said that the calendars in question were never introduced before any court. She recalled a discussion following Coates' deposition on July 30, 1992, in which Neenan asked Coates about back year calendars. Either she or Neenan told Coates that such calendars would be "helpful," and Coates said that he thought he

---

12. Gossett testified that she had a similar conversation with James Cagle the following day. Cagle testified in Canady's defense that such an encounter never took place.

13. Gossett later gave a statement to a T.B.I. agent. She said that the meeting at Forbes' office occurred around June or July of 1992. She told the agent that the encounter with Cana-

dy occurred on August 23rd, but explained that she determined it had been August 19th after discussing it with a coworker.

14. Bates, as noted, conceded that he supported Judge Bell and that he met with Gilbert. He denied yelling at Gilbert or threatening him in any way.

could arrange to get them. Forbes denied that she told Coates "I wish you hadn't said that."

In preparation for trial Forbes worked twelve to fourteen hour days, and she was physically and mentally exhausted. On August 21, 1992, she arrived at the office at 6:30 a.m., and she faxed a proposed exhibit list to Gerald Neenan at 7:14 a.m. There was no mention of calendars on the list. After she received the information from Henegar, including the specific reference to Coates' calendar, she faxed a message to Neenan which said, "Please add Coates' calendar." When she received Neenan's return fax with the blank space, she asked Coates the years of the calendars. Coates replied 1990, 1991, and 1992, which she communicated to Neenan.

Forbes did not discuss calendars with either Canady or Coates. She did not review the calendars with Coates, and it did not occur to her that they might appear to be contemporaneous. After the Canady deposition on August 26, 1992, it appeared that Bates did not realize the calendars were reconstructions. She discussed the matter with Coates and Neenan, and then sent a letter of explanation to Bates.[15]

Richard Canady testified that he was a life-long resident of Hickman County and that he had served on the county commission for four years. He learned about the ouster suits against Coates in the news but was not involved in them. He denied serving subpoenas in the case but admitted riding with the deputy sheriff to help find the people to be served, among them Douglas Bates. Coates asked him to be present when Bates looked at possible trial exhibits on August 22nd. According to Coates, Bates was to copy the material but not take it from the office.

Canady admitted that he went to H & L Printing and obtained one calendar for 1989, two for 1990, and one for 1991. He needed the calendars to prepare for an audit by the Internal Revenue Service. He did not ask for specific years and he did not write in the calendars. He had mentioned to Coates that he was looking for back year calendars and

Coates asked him to get some for him too. Canady gave two of the calendars to Coates, but he did not know why Coates needed them.

Canady admitted talking to Rhonda Gossett outside of Coates' office in August of 1992. He told her he understood that there had been a coding error in the books and that if she had made the error she should take the blame for it. Gossett told him she had already discussed the matter with Coates. He denied telling her that he would say she was lying if she repeated the conversation.

**I**

Both Forbes and Canady challenge the sufficiency of the evidence. The standard for review by an appellate court is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2787–88, 61 L.Ed.2d 560 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn.1985); Tenn.R.App.P. 13(e). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn.1978). In determining the sufficiency of the evidence, we do not reweigh the evidence, *id.*, nor do we substitute our inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956).

**A**

Forbes was convicted of fabricating evidence in violation of Tennessee Code Annotated section 39–16–503(a)(2), which reads: "It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to: [m]ake, present, or use any record, document, or thing with knowledge of its falsity and with intent to affect the course or outcome of the investiga-

---

**15.** A number of character witnesses related their opinions of Forbes' honesty as well as her repu-

tation for truth and veracity. The state produced rebuttal witnesses in this regard.

tion or official proceeding." [16] An "official proceeding" is defined as "any type of administrative, executive, legislative or judicial proceeding that may be conducted before a public servant authorized by law to take statements under oath." Tenn.Code Ann. § 39–11–106(25). The jury was also charged that a conviction could be based upon one's criminal responsibility for the conduct of another. *See* Tenn.Code Ann. § 39–11–402.

Preliminarily, Forbes contends that the prevailing standards of appellate review are inapplicable because of the alleged non-unanimity of the jury's verdict with regard to the "making" or "presenting" components of the offense. She cites *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn.1993), in which the court discussed the constitutional right to a unanimous verdict and the State's obligation to elect which offense, if there is evidence of more than one, it relies upon to seek a conviction. The Court noted: "[A]n appellate court asked to review the legal sufficiency of the evidence can hardly be confident that it has discharged its function properly, in the absence of an election." Although we recognize the unanimity problem in this case as discussed herein, we do not view *Shelton* as a broad rejection of our traditional standards of reviewing the legal sufficiency of the evidence. Instead, the question guiding our review continues to be whether there was evidence for any rational trier of fact to have found all of the essential elements of the offense beyond a reasonable doubt.

In this regard, the proof was far from overwhelming, marred by obvious acrimony among the participants, and clouded with negative political overtones. Nonetheless, there was testimony that Forbes or Neenan asked Coates about calendars for prior years, and learned that he either had none or had none that were detailed and contemporaneous. Forbes said, "I wish you hadn't said that," and then asked whether Coates could obtain such calendars. There was evidence that Coates produced calendars for 1990 and 1991 shortly before the trial, and made nota-

tions in them while reviewing records in Forbes' office on August 21, 1992. The entries were made so as to appear contemporaneous with the dates of Coates' travel in an attempt to corroborate his whereabouts. The calendars were included on the list of proposed exhibits at the prompting of Forbes, and then presented to opposing counsel within days of the pending trial. When viewed in a light most favorable to the prosecution, the evidence was marginally sufficient to support the jury's verdict.[17]

In a related issue, Forbes contends that the "state did not prove all the elements of the offense" because (a) the fabrication of evidence statute should not apply to civil discovery procedures and (b) the calendars were never introduced as "evidence" in the official proceeding, i.e., the ouster trial. She cites Tennessee Rule of Evidence 104, arguing that an item is not "evidence" until ruled upon by a trial judge; she also underscores her argument by noting that the punishment for this crime, which did not occur in the actual proceeding, is greater than that for perjury.

Our conclusion that the evidence was sufficient to support the jury's verdict necessarily entails a finding that the state proved all of the elements of the offense. Forbes' argument is essentially that the statute should not apply to the facts of her case. We disagree. The statute expressly applies to "official proceedings," of which a judicial trial is one. Further, the statute expressly applies if an offense occurs when the official proceeding is "pending" or "in progress," which we interpret to mean before or during the proceeding. To construe "evidence" as requiring the trial judge to make a ruling under Rule 104 would largely eviscerate the plain language that the offense may occur while an official proceeding is merely pending. Moreover, the statute defines "evidence" as "any record, document or thing." The narrow interpretation urged by Forbes is simply inconsistent with the broad terms used by the legislature in writing the statute.

**16.** The indictment charged that the false evidence consisted of calendars and a "list of lawyer trips." The State subsequently relied on its proof relative to the calendars.

**17.** In this regard, we conclude that the evidence was legally sufficient as to both the making and presenting of the evidence, notwithstanding the unanimity issue discussed herein.

Similarly, it was the legislature's prerogative to designate the offense as a class C felony.

In this case, the making and presenting of the false evidence occurred during discovery procedures, just before the trial was to begin. Having determined that there was sufficient evidence to satisfy the remaining elements of the offense, we reject Forbes' claim that the statute should not be applied in her case as a matter of law.

## B

■ Canady maintains that the evidence was insufficient to support a conviction for aggravated perjury, which is defined in Tennessee Code Annotated section 39–16–703:

(a) A person commits an offense who, with intent to deceive:

(1) Commits perjury as defined in § 39–16–702;

(2) The false statement is made during or in connection with an official proceeding; and

(3) The false statement is material.

A statement is material when "irrespective of its admissibility under the rules of evidence, [it] could have affected the course or outcome of the official proceeding." Tenn.Code Ann. § 39–16–701(1). An "official proceeding" means "any type of administrative, executive, judicial or legislative proceeding that is conducted before a public servant authorized by law to take statements under oath in that proceeding." Tenn.Code Ann. § 39–16–701(2). Finally, a "statement" means "any representation of fact." Tenn.Code Ann. § 39–16–703(3).

The colloquy relied upon by the State occurred during Canady's deposition on August 26, 1992. Canady was questioned by Douglas Bates as follows:

Q: Did you go into a printing shop?

A: Okay.

Q: Did you?

A: Yes.

Q: And which ones did you go in?

A: H & L.

Q: What did you get?

A: I got a calendar for 1988 and 1989 and 1990 and 1991.

Q: What did you do with those calendars?

A: Doug, it is kind of personal.

Q: What did you do with those calendars, sir?

A: I am being audited by the Internal Revenue [Service] is the reason I got the calendars.

Canady argues that none of his statements were false. He testified at trial that he was in fact being audited by the Internal Revenue Service, and he introduced a document indicating that he had been requested by that agency to produce certain records for prior years. The letter was dated August 18, 1992. Canady acknowledged that he gave two of the calendars to Coates, though he did not know why Coates wanted them. He was never asked about this by Bates in the deposition. The State maintains that the evidence was sufficient because Canady was being evasive and intended to deceive Bates by not telling the full truth about the calendars. The State argues on appeal that Canady's answer was "unresponsive" and, at best, "a partial truth."

Canady cites *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), the leading case interpreting "falsity" under the federal perjury statute, 18 United States Code Annotated section 1621. There the alleged perjury was based on the following sworn testimony:

Q. Do you have any bank accounts in Swiss banks, Mr. Bronston?

A. No, sir.

Q. Have you ever?

A. *The company had an account there for about six months, in Zurich.*

Q. Have you any nominees who have bank accounts in Swiss banks?

A. No, sir.

Q. Have you ever?

A. No, sir.

*Id.* at 355, 93 S.Ct. at 598 (emphasis added). The proof established that the underscored response was technically true even though Bronston himself had a personal account as well. Nonetheless, the Court reversed his conviction, holding that a sworn representa-

tion of fact that is literally true but unresponsive or even misleading by "negative implication" is not a sufficient basis for a perjury conviction. *Id.* at 361–62, 93 S.Ct. at 601–02. To the contrary, rather than validate an overly broad application of the perjury statute, the Court noted the burden upon the examiner:

> It is the responsibility of the lawyer to probe; testimonial interrogation, and cross examination in particular, is a probing, prying, pressing form of inquiry. If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination.

*Id.* at 358–359, 93 S.Ct. at 599–600. Further, the Court held that it was "no answer to say that here the jury found that petitioner intended to mislead his examiner." *Id.* at 359, 93 S.Ct. at 600.

*Bronston* has been applied and followed by nearly every federal circuit and the majority of state courts. *See* Annotation, *Incomplete, Misleading, or Unresponsive But Literally True Statement as Perjury,* 69 A.L.R.3d 993 (1976 & Supp.1995). Moreover, the rationale adopted in *Bronston* was used in Tennessee long ago in *Lamden v. State,* 24 Tenn. 83 (Tenn.1844). There a creditor swore that no money had been paid on a note held by him against an insolvent estate. The creditor did not mention, however, the receipt of "a set off for medical expenses." Our supreme court reversed the creditor's perjury conviction, holding that his response to the propounded question was literally true and not "false in the legal or ordinary sense...." *Id.* at 90. The court said: "It is true ... that a man, careful of conscience and character when thus interrogated, would not place himself within the narrow and painful limits of mere literal truth; still if this be done, it does not constitute a proper case for the assignment of the perjury." *Id.*

Although we recognize the inherent pernicious effects of perjury on our judicial system as a whole, we believe that the principles of *Bronston* and *Lamden* apply under the particular facts of this case. The question asked by Bates was broad and non-specific; the answer given by Canady was literally true, even if it omitted the entire truth of the matter. He was never asked whether he gave calendars to Coates or whether he did anything with the calendars other than use them to prepare for inquiries by the Internal Revenue Service. Canady testified that he was, in fact, being investigated by the IRS, something the State did not contest. In fact, the prosecution's summation indicates it was aware of the problem:

> Now, let's just take everything [Canady] says as the gospel truth, let's just assume he's telling the truth about needing the calendars for the I.R.S. audit; he still lied on that deposition.... He got into the deposition ... [and] two-stepped around a little bit on the questions he was being asked by Mr. Bates.... Then he gets to the point that Mr. Bates says, 'What did you do with the calendars?'

> \*　\*　\*　\*　\*　\*

> Now, Canady knows what Bates is getting at. Canady knows that he's turned these calendars over to Coates. He knows where Bates is going and what he's looking for. Now should Bates have gone on and asked him the next question: 'Did you give any to James Coates?' Yeah, he should have. It would [have] been much more thorough.... But, nonetheless, Mr. Canady knowingly gave him ... a half-truth, leaving out the part of the truth that he didn't want to tell him and that he knew that Mr. Bates was getting at.

> \*　\*　\*　\*　\*　\*

> And I suggest to you, ladies and gentlemen, just like I tried to get him to say on the witness stand, if you knowingly tell a half-truth, if you knowingly tell only part of the truth, leaving out part, and you do that with the intent to deceive somebody, that's a lie just like any other lie.

As we have discussed, proof that Canady told a "half-truth" is not legally sufficient evidence to support a conviction for making a false representation of fact. Canady's conviction is, therefore, reversed and the case against him is dismissed.

## II

■ Forbes next argues that the judgment was a nullity because there is no crime of "fabricating evidence" under Tennessee law. She claims that the term only appears in the heading to § 39–16–503, and that the heading is not to be construed as part of the law. *See* Tenn.Code Ann. § 1–3–109. She further claims that the offense in the body of the statute requires a defendant to "make, present, or use" evidence known to be false, and that the jury's verdict of "fabricating evidence" does not disclose which offense she was convicted of, rendering it a nullity.[18]

We disagree. The statute, as noted by Forbes, is patterned after Model Penal Code § 241.1. Similarly worded statutes exist in a number of jurisdictions.[19] The indictment charged the offense by referring to the "making and presenting" of evidence known to be false, and by citing the statute alleged to be violated. That the jury returned a verdict which referred to the offense by the name in the heading to the statute does not render the judgment a nullity. The cases cited by Forbes are distinguishable. In *State v. Brown*, 693 S.W.2d 369, 370 (Tenn. Crim.App.1985), the defendant was charged with arson but convicted of burning insured property. In *State v. Morris*, 788 S.W.2d 820, 824 (Tenn.Crim.App.1990), the defendant was charged with aggravated sexual battery but convicted of aggravated rape. In both cases, the jury returned verdicts for offenses that were not charged in the indictment or embraced in the indictment as lesser included offenses. By contrast, it is clear that the jury in the present case returned a verdict on the charged offense.

## III

■ Forbes next argues that the trial court's instructions to the jury permitted a non-unanimous verdict of guilt in violation of the United States and Tennessee Constitutions. The indictment charged Forbes with "making *and* presenting" the calendars in question; over counsel's objection, the trial court instructed the jury the offense was complete if Forbes "made *or* presented" the calendars. While conceding that the indictment itself was not defective, Forbes claims that the disjunctive form of the jury charge allowed the jury to convict her for either making the calendars (on August 21, 1992), or presenting the calendars (on August 22, 1992). The instruction coupled with the evidence of two separate offenses, or at the very least two separate acts establishing an offense, resulted in a substantial possibility of a non-unanimous jury verdict. The State maintains that the indictment provided notice of the charged offense and that its reference to "making and presenting" was mere surplusage.

■ Under Tennessee law, a defendant has a fundamental constitutional right to a unanimous verdict before a conviction for a criminal offense may be imposed. *State v. Shelton*, 851 S.W.2d at 134; *State v. Brown*, 823 S.W.2d 576, 583 (Tenn.Crim.App. 1991). Protection of this right often requires "special precautions [by the court] to ensure

---

**18.** In this regard, she notes that the jury instructions compounded the problem by charging "making or presenting" the calendars even though the indictment alleged "making and presenting" the calendars. This issue will be addressed in more detail herein.

**19.** Comparable statutes in other jurisdictions employ the identical "makes, presents or uses" language. *See, e.g.,* Alaska Stat. § 11.56.610 (1989); Conn.Gen.Stat.Ann. § 53a–155 (West 1994); Fla. Stat.Ann. § 918.13 (West 1985); Mo.Rev.Stat. § 575.100 (Vernon 1995); Mont.Code Ann. § 45–7–207 (1993); 18 Pa.Cons.Stat.Ann. § 4910 (Supp.1995); Tex.Penal Code Ann. § 37.09 (West 1994). Others use language which is substantially similar. *See, e.g.,* Ala.Code § 13A–10–129 (1994) ("makes, presents or offers"); Ariz.Rev. Stat.Ann. § 13–2809 (1989) ("makes, produces or offers"); Colo.Rev.Stat. § 18–8–610 (1986 & Supp.1995) ("makes, presents or offers"); Del. Code Ann. tit. 11, § 5–1269 (Supp.1994) ("produces or offers"); Ga.Code Ann. § 16–10–94 (1992) ("makes, devises, prepares or plants"); Haw.Rev.Stat. § 37–710–1076 (1994) ("makes, presents or offers"); Ky.Rev.Stat.Ann. § 524.100 (Michie/Bobbs Merrill 1990) ("fabricating"); Me. Rev.Stat.Ann. tit. 17–A, § 455 (1983) ("presents or uses"); Neb.Rev.Stat. § 28–922 (1989) ("makes, presents or offers"); N.J.Rev.Stat.Ann. § 2C:28–6 (West 1995) ("makes, devises, prepares, presents, offers or uses"); N.M.Stat.Ann. § 30–22–5 (Michie 1978) ("fabricating"); N.Y.Penal Law § 215.40(1)(b) (McKinney Supp. 1994) ("produces or offers"); Or.Rev.Stat. § 162.295 (1990) ("makes, produces or offers"); Wash.Rev.Code Ann. § 9A.72.150 (West 1988) ("presents or offers").

that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence." *Id.* at 134. Where there is evidence of multiple offenses, the precaution is the doctrine of election, which requires the state to elect and identify at the end of its case in chief the exact offense for which it seeks conviction. *State v. Shelton,* 851 S.W.2d at 134; *Burlison v. State,* 501 S.W.2d 801, 804 (Tenn.1973). Where there is technically one offense, but evidence of multiple acts which would constitute the offense, a defendant is still entitled to the protection of unanimity:

> [I]n cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts. The assessment of this potential would involve consideration of the allegations made and the statutory offense charged, as well as the actual evidence presented.

*State v. Brown,* 823 S.W.2d at 583 (citing, *United States v. Gipson,* 553 F.2d 453 (5th Cir.1977) and *United States v. Beros,* 833 F.2d 455 (3rd Cir.1987)).

In *United States v. Beros, supra,* two counts of an indictment charged that the defendant "did willfully and unlawfully embezzle, steal, abstract and convert to his own use" the money and property of his trade union in violation of United States Code sections 501 and 664. The evidence revealed three factual scenarios for the § 501 violation and four factual predicates for the § 664 violation. In charging the jury, the district court repeated the conjunctive "embezzle, steal, abstract and convert" language used in the indictment; however, the court further charged that the actual statutory provisions were "worded in the disjunctive, that is, a defendant may be guilty of an offense if he embezzled, stole, abstracted, or converted" the property in question. Further, the court charged: "[I]f you find beyond a reasonable

doubt that one method, mode, or manner of violating the law occurred, that is sufficient to find the defendant guilty so long as you agree unanimously upon the particular method, mode or manner that occurred." *Beros,* 833 F.2d at 459–60. Despite the unanimity instruction with regard to the *method* of committing the offense, the Third Circuit Court of Appeal ruled that reversible error was committed because the instructions did not further address the requirement that the jury be unanimous with respect to the underlying *factual* predicates. *Id.,* at 462.

Similarly, in *Vanarsdall v. State,* 919 S.W.2d 626 (Tenn.Crim.App.1995), the defendant was convicted of especially aggravated sexual exploitation of a minor. The indictment charged that he "unlawfully and knowingly [did] transport a minor ... to participate in the performance of sexual activity or simulated sexual activity which is patently offensive...." The evidence revealed three separate sexual incidents, yet the trial court denied the defendant's request that the State elect which act it relied upon to prove the offense. Our court held that the trial court committed reversible error. *Id.* at 633. Moreover, our court also noted that although the indictment alleged the "transported" element, the trial court instructed the jury that conviction could be based on "promoting, employing, using, assisting, or transporting," i.e., all the various forms of committing the offense under the statute. This disjunctive instruction, coupled with the failure to elect the sexual act relied upon, highlighted the potential that the jury's verdict was not unanimous. The court stressed that "the instruction ... should be limited to the precise offense alleged in the charging instrument to the exclusion of the remaining theories." *Id.* at 633 (quoting, *State v. Wayne E. Mitchell,* No. 01C01–9209–CR–00295 [1993 WL 65844] (Tenn.Crim.App., Nashville, March 1, 1993), *perm. to appeal denied,* (Tenn.1993)).

We believe the unanimity interest was implicated here as well. The statute provides that fabricating evidence may consist of "making, presenting, or using" evidence known to be false; in other words, there are

potentially three ways to commit the offense. *See United States v. Gipson*, 553 F.2d at 456. Whether there is one offense or several depends largely on the indictment; here, the indictment charged Forbes in a single count with "making and presenting" calendars known to be false. Forbes concedes that no unanimity issue would be present had the trial judge instructed the jury with the same conjunctive language. However, the trial court charged the jury that conviction could be based upon the "making or presenting" of the evidence. Thus, even if interpreted as a single offense in the indictment, the evidence revealed that the calendars were *made* in Forbes' office on August 21st, and then *presented* in Coates' office on August 22nd. The indictment would have required a finding of both to convict, yet the charge permitted a finding of one or the other.

The trial court took no precautions to preserve unanimity; the only instruction in this regard was "the verdict must be unanimous." As a result, there was a strong possibility of a composite jury verdict in violation of Forbes' federal and state constitutional rights to a unanimous jury verdict. The judgment of conviction must be reversed and the case remanded for a new trial.

**IV**

 Forbes argues that the trial court committed a host of additional instructional errors, the cumulative effect of which denied her a fair trial and amounted to reversible error. She claims that the trial court should have instructed the jury (a) that the "official proceeding" specifically referred to the ouster trial, (b) that the calendars had to be "presented" to the trial judge in the civil ouster trial, and (c) that evidence of "mere negligence or lack of care" did not prove knowledge of falsity. In each instance, counsel for Forbes presented the trial court with a written request for a special jury instruction pursuant to Tennessee Rules of Criminal Procedure 30(a).

 A defendant has a constitutional right to a correct and complete charge of the law. *State v. Teel*, 793 S.W.2d 236, 249 (Tenn.1990). A trial judge should properly instruct the jury on the law governing issues

raised by the evidence introduced at trial. When the trial judge gives instructions that correctly, fully, and fairly set forth the applicable law, it is not error to refuse to give a special requested instruction. *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn.Crim.App. 1987). We must review the entire charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim.App.1994).

We note that the trial court's charge essentially followed Tennessee Pattern Jury Instruction for Criminal Cases section 26.03. The definition of "official proceeding" was taken directly from statutory law, and it correctly informed the jury that a judicial proceeding was included. Thus, the judge did not err in refusing to instruct that the judicial proceeding in this case was the ouster trial. Similarly, we have held that, given the broad statutory language, it was not necessary that the evidence be "presented" to the trial judge to constitute the offense; thus, Forbes' special request was properly denied as an incorrect statement of law. Finally, the trial court fully and fairly defined the "knowingly" element of the offense, and it also informed the jury that the element was proven if Forbes acted intentionally. While the appellant's assertion relative to her "negligence or lack of due care" may have been appropriate for argument under the facts in this case, it was not reversible error to refuse to so charge the jury.

**V**

 In her next issue, Forbes contends that Tennessee Code Annotated section 39–16–503(a)(2) was unconstitutionally vague and overbroad as applied to this case. She concedes that the statute passes constitutional muster on its face, but maintains that the trial court's instructions to the jury did not sufficiently define the elements of the offense so as to provide the notice and fair warning for conviction mandated by due process.

 A statute may be unconstitutionally vague if its prohibitions are not clearly defined and are susceptible to different inter-

pretations as to what conduct is actually proscribed. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *Baggett v. Bullitt,* 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964). A statute may be overbroad, on the other hand, where its language is not vague but literally encompasses constitutionally protected activity. *Grayned,* 408 U.S. at 114–15, 92 S.Ct. at 2302–03. The due process implications of both are twofold: they do not give fair notice that certain activities may be unlawful; and they do not set reasonably clear guidelines for law enforcement officials and courts, thus inviting arbitrary and discriminatory enforcement. *See Rose v. Locke,* 423 U.S. 48, 49–50, 96 S.Ct. 243, 243–44, 46 L.Ed.2d 185 (1975); *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 1246–47, 39 L.Ed.2d 605 (1974).

We conclude that the statute provides sufficient notice of conduct that is prohibited both on its face and as applied to the facts in this case. The elements of the offense—that an official proceeding be pending or in progress and that one make, present or use evidence known to be false with the intent to influence the outcome of the proceeding—provide fair warning and notice as to the nature of conduct proscribed. Although the physical acts are broadly defined, the culpable mental states necessary to commit the offense sufficiently clarify the statute and narrow its application. Moreover, as we have held, the jury charge provided full, fair, and correct guidelines for determining whether the evidence in *this* case satisfied the elements of the offense. Accordingly, we conclude that the conviction of Forbes under the statute did not violate due process.

## VI

█ Forbes argues that the trial court erred with respect to its charge on criminal responsibility, which was as follows:

The defendant is criminally responsible for an offense committed by another if the defendant solicits, directs, aids, or attempts to aid another person to commit an offense, and the defendant acts with intent to promote or assists the commission of

the offense or to benefit in the proceeds or results of the offense.

*See* Tenn.Code Ann. § 39–11–402(2). Forbes takes issue with the "attempts to aid" portion of the instruction, contending that it is wrong to punish someone who merely attempted to aid another in the commission of an offense for the principal offense itself. At most, one who attempts to aid another, she argues, should only be convicted for an attempt to commit the principal offense.

As the State notes, the instruction comports with the statutory definition of criminal responsibility, which essentially codified common law principles relative to aiders and abettors. *See* Tenn.Code Ann. § 39–11–402(2) (sentencing commission comments). An aider and abettor was "one who advised, counseled, procured, or encouraged another to commit a crime." *Flippen v. State,* 211 Tenn. 507, 514, 365 S.W.2d 895, 899 (1963); *State v. Rodriguez,* 752 S.W.2d 108, 111 (Tenn.Crim.App.1988). The case law, like the present statute, set forth a broad basis upon which to impose criminal responsibility; for example, although "mere presence" was insufficient, one needed only aid and abet or "be ready and consenting to aid and abet in the commission of the offense" to be punished as a principal offender. *Anglin v. State,* 553 S.W.2d 616, 619 (Tenn.Crim.App. 1977). In our view, "ready and consenting" to aid and abet was equally if not more broad than the statutory language to which Forbes now objects.

The code further provides that the guilt of one who is criminally responsible is not in anyway affected by the conviction or acquittal of any other parties to the offense. Tenn. Code Ann. § 39–11–407(2). Thus, despite the potential for seemingly anomalous results, the legislature has indicated its intent to punish those who participate in criminal offenses in a broad manner. Accordingly, we conclude that the instruction, as read verbatim from the statute, was not improper.

## VII

█ Forbes next argues that the trial court should have instructed the jury on the lesser included offense of attempt to fabricate evidence. She argues that such a

charge was supported by the evidence and particularly appropriate in light of her claim with regard to the preceding issue. The State maintains that the evidence clearly showed Forbes' guilt of the greater offense, rendering an instruction on attempt unnecessary.

A trial court is required to charge a jury regarding a lesser included offense if there is evidence introduced at trial which would support a conviction for that offense. *Johnson v. State,* 531 S.W.2d 558, 559 (Tenn.1975); *Strader v. State,* 210 Tenn. 669, 679, 362 S.W.2d 224, 228 (1962); *see* Tenn.Code Ann. § 40–18–110. "[W]here the evidence, upon any view the jury may take of it, permits an inference of guilt as to such lesser included offenses, it is the mandatory duty of the Trial Judge to charge all the law as to each of such offenses, and a failure to do so requires a reversal and a new trial." *Strader v. State,* 210 Tenn. at 679, 362 S.W.2d at 228. In the absence of such evidence, however, the accused is not entitled to an instruction. *State v. Mellons,* 557 S.W.2d 497, 499 (Tenn.1977).

An attempt is defined in part as an act "with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn.Code Ann. § 39–12–101(a)(3). As we have said, the evidence of Forbes' guilt was not overwhelming, and it was, in our view, susceptible to a credible inference that an attempted offense was committed. *See State v. Staggs,* 554 S.W.2d 620, 624 (Tenn.1977) (court should have charged attempted robbery as lesser included of assault with intent to commit robbery with a deadly weapon). Although the state's theory was in part based on criminal responsibility principles, a charge on attempt would have given the jury a more thorough instructional basis upon which to evaluate Forbes' conduct. Accordingly, upon a retrial and similar proof, the offense of attempt should be charged to the jury.

## VIII

Forbes contends that the trial court committed reversible error in excluding her notes of the closing argument she had planned to give in the ouster trial. According to the defense proffer, the notes were prepared on August 23, 1992, two days after Coates allegedly made the false calendars and three days before the trial was to begin. Forbes argues that there were no references to Coates' calendars in her notes for summation, and that this omission was probative of her state of mind. The State maintains that the trial court properly ruled that the notes were irrelevant.

"Relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence." Tenn.R.Evid. 401. The determination of whether proffered evidence is relevant is left to the discretion of the trial judge. A treatise on Tennessee evidence law offers guidance on the prevailing standard of review:

> Because an assessment of whether a piece of evidence is relevant requires an understanding of the case's theory and other evidence as well as a familiarity with the evidence in question, appellate courts give great deference to a trial judge's decision on relevance issues. Often it is stated that a trial court's decision on relevance will be reversed only for an abuse of discretion. *To facilitate appellate review, the trial judge should state on the record the reasons for admitting or excluding evidence on relevancy grounds.*

N. Cohen, D. Paine, and S. Sheppeard, *Tennessee Law of Evidence,* § 401.5 at 70 (2d ed. 1990) (emphasis added; footnotes omitted).

The trial court made no specific findings in excluding the evidence, hampering our review to some extent. The proffer indicates that the notes were made soon after the alleged offense and immediately prior to the ouster trial. The notes do not mention the calendars, which were obviously the focal point of the state's case. We believe that the notes were, under the broad definition of relevance, probative of Forbes' mental state.

In sum, they were relevant to whether she knew the calendars were false, and to a greater degree, whether she made or presented them with the intent to influence the outcome of the proceedings.

The State insists on appeal that the trial court's ruling was correct because the notes were "self-serving" and of "questionable reliability." Neither assertion was made by the State in the trial court, nor backed by a finding by the trial judge; moreover, the foundation laid by the defense would seem to support the opposite finding. Even extending deference to the trial court, we believe that the record does not support the ruling that the evidence was simply not relevant. Absent specific findings by the court supporting exclusion, or a showing of inadmissibility by the State on some other ground, the evidence should be admitted if again offered in the event of a retrial.

## IX

■ Forbes next argues that the trial court erred by ruling that she could not impeach Douglas Bates with the answers he gave to interrogatories on July 1, 1992. The defense claimed that Bates withheld information in his responses and did not comply with his duty to supplement his answers when the information became available. After a jury out hearing and discussion, the court sustained the prosecution's objection that the evidence was "irrelevant," "immaterial," and without impeachment value.

■ A denial of the right to an effective cross examination is "constitutional error of the first magnitude" and amounts to a violation of the basic right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim.App.1980) (quoting, *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1978)). While great latitude in the area of impeachment should be granted, the propriety, scope, and manner of the cross examination still rest with the discretion of the trial court. *Coffee v. State*, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948); *State v. Horne*, 652 S.W.2d 916, 918 (Tenn.Crim.App. 1983). Appellate courts will not disturb discretionary limits on cross examination absent

clear and plain abuse. *State v. Fowler*, 213 Tenn. 239, 253, 373 S.W.2d 460, 466 (1963).

We conclude that the court did not abuse its discretion in this instance. The defense wanted to show that Bates did not mention the $351 check payable to Centerville Tire and Auto, nor did he supplement his answers when he developed evidence regarding the "double dipping" matters. However, contrary to Forbes' argument at trial and on appeal, such evidence was, at most, marginally probative of the witness' bias. Moreover, we note that the interrogatories and Bates' responses were admitted into evidence later in the trial via the testimony of Gerald Neenan. While the defense may have preferred direct impeachment of Bates with the interrogatories, there was no basis for reversible error.

## X

■ Forbes and Canady argue that the trial court committed reversible error by refusing to excuse a juror during trial for bias. The argument is based on an incident which occurred during Canady's testimony. The juror, during a break in the proceedings, informed the trial court:

> This morning when Mr. Canady was on the witness stand, I observed Mr. Hollins [counsel for Forbes] sitting over there and going like this and going like that (indicating by nodding and shaking her head), and I thought that he was maybe coaching the witness on how to answer the questions.

Both Canady and Forbes immediately requested that the juror be excused for potential bias and replaced with an alternate juror. Mr. Raybin, co-counsel for Forbes, explained that the juror's perceptions may have been based on an emphatic tactical discussion he and Mr. Hollins were having while Canady testified. At one point, Mr. Hollins shook his head "no," while communicating with Mr. Raybin, but at no point was he communicating or trying to communicate with Canady. The trial court accepted counsel's factual statement, yet the State opposed removing the juror. The court then had the following exchange with the juror:

> *The Court:* [I]f you think what you saw even might affect your judgment in decid-

ing this case, now is the time for you to tell me.

*Juror:* It doesn't—it wouldn't change my feelings on whether I thought a person was guilty or not guilty, but—

*The Court:* My question is, might it affect your judgment as to whether someone was guilty or not guilty?

*Juror:* No, sir, it would not.

*The Court:* And you can unequivocally state that that would not have any effect on the decision you reach in this case?

*Juror:* That's right.

*The Court:* Okay. Have you communicated what you thought you saw to any other juror?

*Juror:* No, sir, I have not.

*The Court:* Okay. I honestly think what you saw was something that was innocent.

*Juror:* Okay.

*The Court:* And what makes me believe that's true is Mr. Canady wasn't testifying about Mrs. Forbes. But if you think that even might affect you, you tell me now.

*Juror:* No, sir, it would not.

*The Court:* Okay.

*Juror:* It just appeared that he was telling him whether to say yes or no.

*The Court:* Well, I think what you—you might not have seen the whole thing. Mr. Raybin was whispering questions in [Mr. Hollins'] ear and he was nodding and shaking his head—

*Juror:* Okay.

*The Court:*—but [Mr. Hollins] was probably looking at the witness that was testifying. But if you're sure . . .

*Juror:* I'm sure.

■ Whether to remove jurors "who become or are found to be unable or disqualified to perform their duties" lies in the discretion of the trial court. *State v. Millbrooks,* 819 S.W.2d 441, 445 (Tenn.Crim.App. 1991); Tenn.R.Crim.P. 24(e). The defendant and the State "are entitled to a fair trial by unbiased jurors and it is the duty of the trial judge to discharge any juror who for any reason cannot or will not do his duty in this regard." *State v. Livingston,* 607 S.W.2d 489, 492 (Tenn.Crim.App.1980); *see State v.*

*Max,* 714 S.W.2d 289, 294 (Tenn.Crim.App. 1986).

■ The juror's initial statement to the trial court indicated potential bias against Canady and Forbes due to what she believed she had observed; nonetheless, the trial court's inquiry into the matter and the colloquy with the juror demonstrated that the incident "unequivocally" would not have an impact on the juror's deliberations. The reason the trial court is afforded discretion in these matters is its ability to engage in precisely this type of inquiry and to observe the demeanor and credibility of the juror. While replacement of the juror with an alternate may have been preferred out of an abundance of caution, we cannot conclude on this record that the trial court abused its discretion in failing to do so.

## XI

■ Finally, Forbes and Canady argue that the trial court committed reversible error in responding to a question asked by the jury during its deliberation. The question was, "Under what circumstances do we, the jury, with the lack of physical evidence, leave this and go to common sense reasoning?" Over objection by both defendants, the trial court re-read the jury charge governing circumstantial evidence.

The appellants argue that the response was an improper comment on the evidence, and that it failed to instruct the jury to place no undue emphasis on the supplemental instruction. The better procedure, they argue, would have been to instruct the jury to continue deliberating. The State maintains that the supplemental instruction was within the authority of the trial judge and that it addressed the correct evidentiary standard to be applied.

■ The trial court has the authority to respond to jury questions with a supplemental instruction. *State v. Moore,* 751 S.W.2d 464, 467 (Tenn.Crim.App.1988). While the better procedure is to admonish the jury not to place undue emphasis on the supplemental instruction and to consider it in conjunction with the entire charge, it is not necessarily reversible error to fail to do so. *State v. Chance,* 778 S.W.2d 457, 461–62

(Tenn.Crim.App.1989); *see Burton v. State,* 217 Tenn. 62, 70–71, 394 S.W.2d 873, 876–77 (Tenn.1965).

We conclude that the supplemental instruction regarding circumstantial evidence was not reversible error. Although the jury's rather cryptic inquiry perhaps deserved no reply other than to continue deliberating, the court merely re-read a portion of the instructions the jury had already heard. The trial court did not comment on specific evidence or testimony introduced at trial. Moreover, while the supplemental instruction should have included an admonishment to place no undue emphasis upon it, the main charge to the jury included an instruction not to single out one instruction over any other. *State v. Chance,* 778 S.W.2d at 462.

## Conclusion

Forbes' conviction for fabricating evidence is reversed and the case is remanded to the trial court for a new trial consistent with this opinion. Canady's conviction for aggravated perjury is reversed and the case against him is dismissed.

SUMMERS and TIPTON, JJ., concur.