IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JULY SESSION, 1997

FILED

March 31, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9607-CC-00284 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | MONTGOMERY COUNTY |
| VS. | ) | |
| | ) | HON. JOHN H. GASAWAY, III |
| ELIZABETH MARIA ORTIZ, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Direct Appeal - Criminally Negligent |
| | ) | Homicide) |

FOR THE APPELLANT:

VAN L. RIGGINS, JR.
Parker, Riggins & Wallace, PLC
118 Franklin Street
Clarksville, TN  37040

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

PETER M. COUGHLAN
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243

JOHN CARNEY
District Attorney General

CHARLES BUSH
Assistant District Attorney
Franklin Street
Clarksville, TN 37040

OPINION FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# OPINION

Appellant Elizabeth Marie Ortiz was convicted by a jury on April 21, 1995 in the Montgomery County Circuit Court of criminally negligent homicide, accessory after the fact, and conspiracy to commit first degree murder. On May 19, 1995, the trial court determined Appellant to be a Range I standard offender and imposed the following sentences: (1) twenty-three years incarceration with the Tennessee Department of Correction for conspiracy to commit first degree murder; (2) two years imprisonment for criminally negligent homicide; and (3) two years for accessory after the fact, all sentences are to be served concurrently. Appellant presents the following issues for our consideration on this direct appeal: (1) whether the trial court erred by initially failing to instruct the jury as to the lesser included offenses of criminal conspiracy; and (2) whether Appellant's sentence is excessive.

After a review of the record, we affirm the judgment of the trial court.

## I. FACTUAL BACKGROUND

The proof shows that at about 2:30 A.M. on April 19, 1994, Blanie J. Watson, Appellant's boyfriend, was fatally shot and beaten as a result of the combined efforts of Appellant and Dmitri Johnson.[1]

Appellant met Dmitri Johnson in the summer of 1993. At that time, Appellant was thirty-three years old, and Johnson was nineteen and still attending high school. During the summer, Appellant befriended Johnson by permitting him to drive her two cars, buying him jewelry and clothes, and giving him hundreds of dollars to spend on himself and his friends.

In May 1993, Appellant moved in with the victim, Blanie Watson, but continued seeing Mr. Johnson. Although Appellant held various jobs, the majority of the money

---

[1] Dmitri Johnson was convicted in a separate trial of second degree murder.

which she gave to Johnson was taken from Mr. Watson. Watson concealed large amounts of cash around the house.

According to Mr. Johnson's testimony, Appellant often described to him the beatings and verbal abuse which Watson allegedly inflicted upon her. Johnson testified that he and Appellant fell in love with each other during the summer of 1993. In September 1993, Appellant and Johnson developed a sexual relationship. At this time, Appellant increasingly talked of leaving her abusive boyfriend, buying a home for Johnson and herself, starting a family with Johnson, and living "happily ever after." At least twice each week, Appellant cried and told Mr. Johnson about how Watson beat her and refused to give her money. Appellant's descriptions of these beatings angered Mr. Johnson, who believed that he had to protect her. Mr. Johnson testified that he never saw Watson abuse Appellant and that all his information about the alleged beatings came from Appellant and her son, who was approximately the same age as Johnson.

As Johnson's relationship with Appellant deepened, his relationship with his family deteriorated. When Mr. Johnson informed Appellant that his parents might move him to Ohio to prevent them from seeing each other, Appellant declared that she would buy a house for Johnson and her and that Mr. Watson would be "out of the picture." Appellant also threatened to commit suicide if Johnson left her.

Appellant and Johnson continued their sexual relationship during the next few months, and she assured Johnson that they would be together once Mr. Watson was gone. At this time, Appellant told Johnson that she could not yet leave Mr. Watson because Watson had $40,000.00 of her money which she wanted to collect. Appellant continued to relate to Mr. Johnson instances of her mistreatment by Watson.

Mr. Johnson testified that though he initially refused Appellant's requests to kill Blanie Watson, he later agreed to commit the homicide after being told by Appellant's son that Watson had beaten Appellant so severely that she was unable to get out of bed. According to Mr. Johnson's testimony, Appellant repeatedly asked Johnson to kill

Watson and suggested various ways of perpetrating the murder, e.g., making the crime look like a robbery by dumping the victim's body on a country road or lying in wait for Watson at Appellant's home. Johnson testified that he told several friends of his intention to kill Mr. Watson.

In the spring of 1994, Appellant moved into a new house, assuring Johnson that this would be their home. However, Appellant allowed Mr. Watson to continue sleeping with her at her new residence despite her claim that the beatings persisted. At some point, Appellant informed Johnson that she was pregnant with his child; however, she later claimed that she had a miscarriage due to the stress caused by Mr. Watson.

According to Mr. Johnson's testimony, Appellant gave him a pistol and $920.00 in cash two weeks prior to the murder. As Appellant handed the gun to Johnson, she allegedly told him to "go ahead and do what you have got to do." Johnson interpreted Appellant's remark to mean that he must murder Mr. Watson. Mr. Johnson further testified that as Appellant handed him the gun, she also told him that she had almost completed the work on their new home and that he would be able to move in soon. Appellant also gave Mr. Johnson $20.00 with which to buy bullets.

Appellant promised Mr. Johnson a stable home environment with the child that she hoped they would have together and assured him that she and Johnson would collect the money from an insurance policy which she had taken out on Mr. Watson. Appellant purchased the life insurance policy on March 16, 1994, only one month prior to the murder. The face amount of the policy was $45,588.00. The policy had an accidental death rider in the amount of $91,000.00. Johnson testified that Appellant wanted him to make the victim's death look accidental in order to get the most money.

Blanie Watson was fatally shot three times and severely beaten on April 19, 1994 at approximately 2:30 A.M. At trial, Appellant and Dmitri Johnson gave contradictory testimony concerning the events surrounding the killing. Appellant testified that Johnson rang the doorbell and shot Mr. Watson several times when Watson opened the door. Watson was wearing his underwear at the time. Appellant

stated that she was lying on the couch and could not see everything that transpired because she held a pillow over her eyes. After being shot three times, Watson managed to walk to the back guest room. Watson began pleading with Johnson to release him. Finally, Johnson threw Watson his clothes so that Johnson could take Watson to the hospital. Appellant further testified that as Watson tried to put on his pants, he lunged for the pistol and took it from Johnson. Johnson used a hand-held vacuum to knock the gun from Watson's hands and then beat Watson in the head. Mr. Watson ran outside the house.

Johnson testified that at Appellant's request, he returned the gun to her around midnight on the night of the murder. After leaving Appellant's house, Johnson later returned in order to terminate his relationship with Appellant because he believed that she was lying to him about marrying and starting a family. Mr. Johnson stated that Appellant was crying when he arrived. Johnson testified that he walked into the back guest room and saw that Watson had been shot three times. Mr. Watson regained consciousness and begged to be released, promising to give Johnson cars and money. Johnson testified that as Watson bled to death, Appellant intermittently urged him not to talk to Watson and to "Make him be quiet." Appellant told Johnson that the two of them had to take Watson out on a country road and leave him there, making it look as though the victim had been robbed. Johnson laid down the gun and threw Appellant her shoes. As Watson tried to put on his pants, he leapt for the gun. At this time, Johnson seized a hand-held vacuum and Appellant directed Johnson to "Get him [the victim]." Johnson began attacking the victim with the vacuum. Mr. Johnson testified that Appellant and Watson fought, Appellant ran down the hallway and began hitting Watson in the head with a hammer. The gun discharged, with the bullet hitting the floor and grazing Appellant's leg. Johnson stated that he followed the victim out the door as Appellant ran into the living room. Johnson picked up a large stick from the lawn and beat Watson over the head with it until the stick broke. Mr. Johnson testified that he

next picked up a grapefruit-sized landscaping rock and hit Watson over the head repeatedly, killing him. Johnson fled the scene before the police arrived.

At trial, Appellant admitted that she cleaned blood off the walls after the victim and Dmitri Johnson went outside. Appellant also testified that she collected Watson's bloody clothes and put them into a plastic bag. Police were unable to recover the shell casings from the pistol.

Appellant admitted that she initially lied to several officers, telling them that she had been attacked and knocked unconscious by two men wearing ski masks and that these men shot and killed Blanie Watson. Moreover, she informed the officers that she was in bed when the shooting occurred. Appellant did not mention Mr. Johnson's participation in the murder and also did not tell the police what actually happened.

Following a police investigation, Johnson was incarcerated pending trial. In order to protect Appellant, Johnson initially alleged that he had shot Watson. While Johnson was in jail, Appellant mailed him many photographs and letters. In numerous letters and tape-recorded telephone conversations, Appellant professed her love for Dmitri Johnson and instructed him on what to say to the prosecutor. Appellant assured Johnson that she would turn herself in, but she never did so. Appellant also said that she would do whatever it took to prevent Johnson from being convicted of second degree murder, including paying for Johnson's attorney. Additionally, Appellant told Johnson that if he testified against her, then he did not love her. Appellant repeatedly declared that she would wait for Johnson, that she wished to have his child, and that their dreams would come true once he was released from prison. However, at trial, Appellant testified that she deliberately deceived Mr. Johnson and that although she promised in a letter to assist him with the criminal charges, she never intended to do so. Even though Johnson's family and lawyer advised him that Appellant was manipulating him, Mr. Johnson testified that he still loved her.

## II. SUPPLEMENTAL JURY CHARGE ON LESSER OFFENSES

Appellant's first contention on this direct appeal is that the trial court committed reversible error by giving the jury a supplemental instruction, after the panel had commenced deliberations. These instructions concerned offenses of conspiracy to commit lesser grades of homicides. Rather than contesting the language employed in the supplemental instruction, Appellant claims that giving the instruction after the jury had begun deliberations was "tantamount to not receiving the instruction at all." Appellant further asserts that the jury ignored the supplemental instructions, and, as support for this allegation, Appellant cites the jury's inconsistent guilty verdicts of conspiracy to commit first degree murder and criminally negligent homicide.

The jury is presumed to follow the trial court's instructions. State v. Newsome, 744 S.W.2d 911, 915 (Tenn. Crim. App. 1987) (citing Craig v. State, 524 S.W.2d 504 (Tenn. Crim. App. 1974)). To overcome this presumption, the accused bears the burden of proving by clear and convincing evidence that an instruction was not followed. State v. Vanzant, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983). An accused has a constitutional right to "a correct and complete charge of the law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); State v. Ruane, 912 S.W.2d 766, 782 (Tenn. Crim. App. 1995). This Court must review the entire jury charge "and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." Forbes, 918 S.W.2d 431, 447 (citing State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994)). Tenn. Code Ann. § 40-18-110(a) imposes a mandatory duty upon trial judges to "charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." Tenn. Code Ann. § 40-18-110(a).

At the conclusion of closing arguments, the trial court initially instructed the jury as to conspiracy to commit first degree murder. However, the court neglected to charge the jury on the lesser offenses of conspiracy to commit second degree murder, conspiracy to commit voluntary manslaughter, and conspiracy to commit criminally

negligent homicide. After defense counsel informed the court of this oversight, the jury was called into the courtroom and given a supplemental instruction as to these lesser offenses. The jury had been deliberating for approximately one hour before the court instructed it as to the lesser. The court gave the jury a written copy of the supplemental instruction to use in its deliberations. The jury again retired to resume deliberations but then returned to the courtroom requesting clarification. The court properly admonished the jury, "You are not to place undue emphasis on this supplemental instruction. This instruction should be carefully considered along with all previous instructions, in light of and in harmony with the others."

Appellant has not carried her burden of demonstrating that the jury did not follow its instructions. Appellant was convicted of the lowest grade of homicide. With respect to Appellant's assertion that the jury ignored the supplemental jury charge, we emphasize that Tennessee law does not require a jury to return consistent verdicts. Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973). In Wiggins, our Supreme Court held, "This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." Id. Appellant does not challenge the sufficiency of the convicting evidence. We decline to speculate as to whether the jury ignored or undervalued the supplemental jury instruction.

### III. SENTENCING

Finally, Appellant contends that her sentence is excessive because the trial court erroneously applied certain enhancement factors.

When an appeal challenges the length, range, or manner of service of a sentence, this Court conducts a de novo review with a presumption that the determination of the trial court was correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption of correctness is "conditioned upon the affirmative showing that the trial court in the record considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to demonstrate such consideration, review of the sentence is purely de novo. Id. If appellate review reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this Court must affirm the sentence. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In conducting a review, this Court must consider the evidence, the presentence report, the sentencing principles, the arguments of counsel, the nature and character of the offense, mitigating and enhancement factors, any statements made by the defendant, and the potential for rehabilitation or treatment. State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993). The defendant bears the burden of showing the impropriety of the sentence imposed. State v. Gregory, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993).

Appellant was convicted of conspiracy to commit first degree murder, a Class A felony and criminally negligent homicide and accessory after the fact, both of which are Class E felonies. Tenn. Code Ann. §§ 40-35-110; 39-13-202; 39-13-212(b); and 39-11-411(c). As a Range I standard offender convicted of Class A and E felonies, Appellant's statutory sentencing range was fifteen to twenty-five years and one to two years, respectively. Tenn. Code Ann. §§ 40-35-112(a)(1) and 40-35-112(a)(5). The trial court sentenced Appellant to three concurrent terms of twenty-three years and two two-year terms of confinement with the Tennessee Department of Correction.

Because she was convicted of a Class A felony, Appellant is not entitled to the presumption in favor of alternative sentencing. Tenn. Code Ann. § 40-35-102(6).

Appellant contends that the trial court improperly applied the following enhancement factors:

> (2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors; and

> (5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense.

Tenn. Code Ann. § 40-35-114.

We address each of these factors seriatim.

Appellant alleges that it is an essential element of the crime of criminal conspiracy that the defendant be a leader in the commission of the offense. Moreover, Appellant argues that there is no factual basis to support the trial court's conclusion that she was a leader in the commission of the crime.

Tenn. Code Ann. § 39-12-103 provides in part:

> (a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Tenn. Code Ann. § 39-12-103(a).

Although both Tennessee Code Annotated Section 39-12-103(a) and section 40-35-114(2) contemplate two or more actors, the conspiracy statute does not mandate that the conspirator be a leader in the commission of the crime in order to be convicted of the offense. This Court has held that Tenn. Code Ann. § 40-35-114(2) does not require that the defendant be the sole leader of the offense but only that he or she be a leader. State v. Freeman, 943 S.W.2d 25, 30-31 (Tenn. Crim. App. 1996); State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). Indeed, in Hicks, we observed that "Both of two criminal actors may be `a leader in the commission of an offense.'" 868 S.W.2d 729, 731.

The trial court properly concluded that the facts warranted enhancing Appellant's sentence for being a leader during the commission of the offense. Tenn. Code Ann. § 40-35-114(2). Dmitri Johnson testified that Appellant assured him that the two of them could live "happily ever after" and have a family once Appellant got her money back from Watson. Appellant often described to Johnson how badly Mr. Watson had beaten her; however, Johnson never saw these beatings. When Mr. Johnson's parents became aware of how Appellant manipulated Mr. Johnson, they threatened to move him to Ohio. When Johnson informed Appellant of the contemplated move, she threatened to kill herself if Johnson left. Therefore, Johnson remained in Tennessee. Mr. Johnson testified that on several occasions, Appellant requested that he kill Blanie Watson. Additionally, Appellant gave Mr. Johnson a pistol and money with which to purchase bullets. Finally, feeling that he must protect Appellant, Johnson agreed to kill Watson after being informed that Appellant had been so severely beaten that she could not get out of bed. Appellant also suggested various ways in which Johnson could perpetrate the murder, including lying in wait for Watson at Appellant's home and making the crime look like a robbery by leaving Watson's body on a country road. Appellant did not call for help or attempt to prevent Johnson from killing the victim. After the murder, Appellant attempted to conceal the truth by cleaning blood off the walls, stuffing the victim's bloody clothes into a garbage bag, and lying to the police about what transpired. Clearly, Appellant was a leader in the commission of the offense.

Appellant similarly argues that exceptionally cruel treatment of the victim is an essential element of the crime of conspiracy. However, a reading of Tenn. Code Ann. § 39-12-103 belies such an interpretation, as a defendant may be convicted of conspiracy without any proof that the defendant treated, or allowed the victim to be treated, with exceptional cruelty.

Appellant further claims that she is not responsible for the acts of her co-conspirator, Mr. Johnson. In Tennessee, it is well-settled law that "The act or

declaration of one conspirator, or accomplice, in the prosecution of the criminal enterprise, is considered the act of all, and is evidence against all." Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). Moreover, in State v. Ralph Thompson, this court upheld the trial court's application of Tenn. Code Ann. § 40-35-114(5) to enhance the sentence of a defendant convicted of conspiracy to commit first degree murder. C.C.A. No. 03C01-9306-CR-00177, (Tenn. Crim. App., June 15, 1994), Knoxville, perm. to appeal denied, (Tenn. 1995).

Whether one believes Appellant's version of events or that of Mr. Johnson, it is apparent that this was a brutal homicide. In both accounts, Mr. Watson was shot, regained consciousness and was beaten over a rather extended period of time. He begged for his life to no avail. Dr. Charles Harlan, the forensic pathologist who performed the autopsy on Watson, testified the victim could have lived for fifteen to twenty minutes after being shot. Even if Appellant did not actively participate in these events, Tennessee Code Annotated Section 40-35-114 (5) allows application of this enhancement factor if a criminal "allows" a victim to be treated with exceptional cruelty. Under these circumstances application of this factor was appropriate.

Accordingly, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE


CONCUR:


_____
JOHN H. PEAY, JUDGE


_____
WILLIAM M. BARKER, JUDGE