IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 19, 2001

## STATE OF TENNESSEE v. CAROLYN A. WOOSTER

**Appeal from the Criminal Court for Dickson County**
**No. CR-4134     Leonard W. Martin, Judge**

———————

**No. M2000–02992-CCA-R3-CD - Filed March 18, 2002**

———————

The defendant, Carolyn A. Wooster, was convicted of aggravated child abuse and neglect, a Class A felony. The trial court imposed a sentence of 15 years. In this appeal, the defendant asserts that (1) the evidence was insufficient to support her conviction and (2) the trial court's failure to give an augmented unanimity instruction was reversible error. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

John Edward Herbison, Nashville, Tennessee, for the appellant, Carolyn A. Wooster.

Paul G. Summers, Attorney General & Reporter; Elizabeth T. Ryan, Assistant Attorney General; and Suzanne Lockert, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

At approximately 7:00 A.M. on March 5, 1998, the defendant brought the victim, a newborn girl, to Horizon Medical Center in Dickson. The defendant explained that she had given birth at home the night before and desired to offer the infant for adoption.

Dr. Valerie Beck, a pediatrician at Horizon Medical Center, examined the infant in the labor and delivery area at about 7:15 A.M. Because the victim's heart rate was only about 70 beats per minute, Dr. Beck classified the victim's condition as critical. She explained that a newly born, crying infant should have a heart rate of between 130 and 140 beats per minute. Dr. Beck observed that the victim was cyanotic and grunting, indicating that the victim was in distress. She determined that there was a substantial risk of death.

At trial, Dr. Beck testified that the low heart rate was due to a low body temperature. According to Dr. Beck, the heart rate drops when exposed to cold temperatures, impairing the heart's

ability to operate correctly. When neither a digital thermometer or a glass thermometer registered a body temperature, Dr. Beck made a diagnosis of severe hypothermia. The victim was placed under a radiant warmer with heated saline bags wrapped in warm towels to raise her temperature. By 7:40 A.M., the baby's temperature had risen to 97 degrees.

Helen Murphy, a registered nurse testified that the defendant claimed that she had given birth at her home on the previous evening and had been assisted by her boyfriend and two nurses. According to Ms. Murphy, the defendant claimed that she had visited an obstetrician on six separate occasions before moving to Tennessee. The defendant informed Ms. Murphy that her water had broken between 10:30 and 11:00 P.M. and that her contractions began immediately thereafter. She explained that she came to the hospital in order to offer the infant for adoption. Because the defendant claimed that she was not experiencing any bleeding, Ms. Murphy initially suspected that the defendant might not have given birth to the baby. Because her suspicions were further aroused when she discovered that the defendant was not producing breast milk and had declined a physical examination, Ms. Murphy asked the Dickson Police Department to investigate.

Later, the defendant consented to a physical examination. After being examined, she was interviewed by Detective Mike Fleaner of the Dickson Police Department and Rosie Skinner of the Department of Children's Services. The defendant again claimed that she had given birth at home and that her boyfriend and two nurses had assisted in the delivery. During the interview, the defendant expressed particular concern about being late for work.

After interviewing the defendant, Detective Fleaner and Ms. Skinner traveled to the defendant's residence to question her boyfriend, Jason Huler. According to Detective Fleaner, Huler stated that he was unaware that the defendant was pregnant and had not helped in any delivery. After interviewing Huler, Detective Fleaner drove to the defendant's place of employment and questioned her a second time. When he arrived, the defendant was in her vehicle, a camper, which was parked in her employer's lot.

After receiving permission to search the camper, Detective Fleaner found a shirt that the defendant had used to clean the infant. Upon further examination at the police department, the defendant admitted that she was alone at the time of birth, and had placed the victim under the house during the course of the night.

At trial, the defendant confirmed that she was alone when she gave birth to a baby girl at her home at approximately 6:20 P.M. on March 4, 1998. According to the defendant, her water broke two and a half days before the delivery. She held and breast fed the baby until about 10:00 P.M., when her boyfriend, who was unaware of her pregnancy, was scheduled to return from work. The defendant stated that she wrapped the infant in a shirt, placed her in a cardboard box, covered her with two towels, and then placed the box in a storage area underneath her house.

The defendant acknowledged that she heard the baby cry around 1:00 A.M., but did not check on her. After hearing whimpering at 4:00 A.M., the defendant claimed that she went to the storage

area, held the infant for a few minutes, and then placed her back in the box. Even though she detected that the infant was cold, the defendant conceded that she returned to the house, leaving the baby outside. The defendant estimated that about one and a half hours later, she came back to the baby and took her into a camper that was parked outside. The defendant testified that she cleaned the baby and attempted to breast feed her while in the camper. She stated that when the baby would not nurse, she took the infant into her residence and at 6:45 A.M., she drove her to Horizon Medical Center.

## I

The defendant contends that the evidence was insufficient to support her conviction for aggravated child abuse and neglect because the state failed to prove that the victim suffered serious bodily injury. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Tennessee Code Annotated section 39-15-402 provides in pertinent part as follows:

> (a) A person commits the offense of aggravated child abuse and neglect who commits the offense of child abuse and neglect as defined in § 39-15-401 and:
> (1) The act of abuse results in serious bodily injury to the child;
> *          *          *
> (b) A violation of this section is a Class B felony; provided, that, if the abused child is six (6) years of age or less, the penalty is a Class A felony.

Tenn. Code Ann. § 39-15-402(a)(1), (b). Child abuse and neglect occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(a). Serious bodily injury is defined as follows:

> "Serious bodily injury" means bodily injury which involves:
> (A) A substantial risk of death;
> (B) Protracted unconsciousness;

(C) Extreme physical pain;

(D) Protracted or obvious disfigurement; or

(E) Protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty[.]

Tenn. Code Ann. § 39-11-106(a)(34). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2).

Here, the defendant chose to give birth without medical assistance. Four hours after birth, the defendant wrapped the newborn victim in a shirt, put her in a box, and placed the box in a storage area under her house for approximately seven and a half hours. The low temperature that night, according to a reading taken by the Dickson Water Plant, was twenty-five degrees. The defendant acknowledged that she was aware her actions could cause harm to the victim and admitted that her infant was cold to the touch during her 4:00 A.M. visit. Some three hours later, the victim's body temperature would not even register on hospital equipment. A medical expert confirmed that the victim faced a substantial risk of death. Thus, there was evidence of each of the elements of the crime. In our view, the jury acted within its prerogative in returning a verdict of guilt.

## II

The defendant next contends that the trial court's instruction on the offense of aggravated child abuse and neglect deprived her of the right to a unanimous jury verdict. A defendant has the fundamental constitutional right under Tennessee law to a unanimous verdict before a conviction for a criminal offense may be imposed. State v. Shelton, 851 S.W.2d 134, 137 (Tenn. Crim. App. 1993); State v. Brown, 823 S.W.2d 576, 581 (Tenn. Crim App. 1991); see also State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1988). Protection of this right may require special precautions by the trial court to ensure that the jury does not reach a "patchwork verdict" based on different offenses. State v. Forbes, 918 S.W.2d 431, 445-46 (Tenn. Crim. App. 1995). When the proof shows the commission of multiple acts with multiple results, the results being separate criminal offenses, and there are insufficient counts in the charging instrument to accommodate all of the offenses shown, the usual precaution to assure jury unanimity is to require the election of offenses. State v. Burlison, 501 S.W.2d 801, 804 (Tenn. 1973); State v. Clabo, 905 S.W.2d 197, 205 (Tenn. Crim. App. 1995); Shelton, 851 S.W.2d at 137. Where there is only one offense resulting from multiple actions of the defendant, however, the proper precaution is to give the jury an augmented instruction relative to the unanimity requirement. See State v. Phillips, 924 S.W.2d 662 (Tenn. 1996); Brown, 823 S.W.2d at 581-83.

Here, the trial court instructed the jury as follows:

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements: (1) [t]hat the defendant did knowingly, other than by accidental means, treat a child in such a manner as to inflict injury; or neglect a child so as to adversely affect the

child's health and welfare; and the act of abuse or neglect resulted in serious bodily injury to the child; and that the child was six years of age or less.

The defendant complains that this instruction invited the jury to reach a "patchwork verdict" with some jurors finding that the defendant committed an act of abuse and others finding she committed an act of neglect.

As pointed out by the state, this case is analogous to the holding in State v. Lemacks, 996 S.W.2d 166 (Tenn. 1999). In Lemacks, the defendant was charged with DUI and claimed that he was not driving his car when the accident occurred. The trial court instructed the jury that it could find the defendant guilty if it found that he was driving while intoxicated or that he had allowed his friend to drive while intoxicated. The defendant argued that the instruction deprived him of the right to a unanimous jury verdict. Our supreme court affirmed his conviction, ruling that the trial court properly charged the jury on both theories of the defendant's guilt. Our high court held that "[t]he right of jury unanimity has never required more than a general verdict in cases where only one offense is at issue based upon a single criminal occurrence." Id. at 171. Further, the court stated that "where the [s]tate seeks to prove one crime arising from one event, we may presume that the jury's general verdict was unanimous." Id.

In our view, no "real potential" for a non-unanimous verdict exists. The defendant was charged with only one offense resulting from a single act, that of exposing a newborn child to below freezing temperatures for as many as seven and a half hours. Under these circumstances, an augmented instruction on the unanimity requirement was not necessary.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE