# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 1, 2009

## STATE OF TENNESSEE v. RASHAD G. ROBINSON

**Direct Appeal from the Circuit Court for Madison County**
**No. 08-327     Roger A. Page, Judge**

---

**No. W2009-00264-CCA-R3-CD  - Filed May 17, 2010**

---

A Madison County jury convicted the defendant, Rashad G. Robinson, of possession of contraband in a penal institution, a Class C felony, two counts of misdemeanor assault, Class A misdemeanors, and vandalism under $500, a Class A misdemeanor. The trial court sentenced the defendant to six years in the Tennessee Department of Correction for the felony conviction and eleven months, twenty-nine days in the county jail for each of the misdemeanor convictions. The court ordered the defendant to serve the sentences consecutively to each other and to case number 07-372. On appeal, the defendant challenges the trial court's jury instructions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

George Morton Googe, District Public Defender, and Paul Edward Meyers, Assistant Public Defender, Jackson, Tennessee, for the appellant, Rashad G. Robinson.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Jerry Woodall, District Attorney General; and Ben Mayo, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

In May 2008, a Madison County grand jury returned an indictment charging the defendant, Rashad G. Robinson, with two counts of aggravated assault, Class C felonies,

possession of contraband in a penal institution, a Class C felony, and vandalism under $500, a Class A misdemeanor. The parties presented the following evidence at the September 19, 2008, trial.

Deputy Nick Rickman, of the Madison County Sheriff's Department, testified that he was on duty at the Criminal Justice Complex from 4:00 p.m. until 12:00 a.m. on December 22, 2007. That night, he was in the A pod, the maximum security wing of the jail, where the defendant was housed in an isolation cell. At 10:00 p.m., the defendant had completed his one hour of recreation time in the day room[1] adjacent to his cell when Deputy Rickman approached the door to the day room, which was closed and locked, and instructed the defendant to lockdown.[2] Deputy Rickman explained that he normally gives inmates a few minutes to gather their belongings and return to their cell. After instructing the defendant, Deputy Rickman went to the control room. He noticed that the defendant had not returned to his cell after three or four minutes passed, so he instructed the defendant over the intercom to lockdown. Deputy Rickman then returned to the day room door, and he observed the defendant:

> standing close to his cell door. . . . [H]e had what appeared to be a towel wrapped around the front of his face, covering his nose and mouth area, going all the way around to the back, tied in the back. [He observed] what appeared to be maybe strands of towels or socks wrapped around his hand, his knuckle area, and also his elbow area.
> . . .
> [He observed] the same thing wrapped around portions of his lower body.

Deputy Rickman repeated his instruction for the defendant to lockdown, but the defendant did not respond.

On cross-examination, Deputy Rickman testified that he, Deputy Hogg, Deputy Jones and Sergeant Lavenue opened the door to the day room. At that point, the defendant went into his cell and grabbed socks containing bars of soap, one in each hand. Deputy Jones then retrieved a shield from the control room. The four deputies entered the day room behind the shield. They each had chemical spray, and they used one burst of spray on the defendant. Deputy Rickman was unaware of any grievance that the defendant might have filed against

---

[1] Deputy Rickman explained that the day room is equipped with showers and a telephone for the inmates' use.

[2] Testimony at trial revealed that "lockdown" means the inmate enters his cell and closes the door. The defendant is then secured in his cell. The deputies can unlock a cell door from the control room but cannot lock a door. Cell doors lock automatically when closed.

other deputies. He was also unaware whether the defendant had requested to speak with a sergeant, doctor, or mental health professional that day. Deputy Rickman stated that it was possible that the defendant was in the isolation cell because other inmates jumped him and that the defendant had been in the hospital for head injuries.

Deputy Anthony Wayne Jones, of the Madison County Sheriff's Department, testified that he responded to a call for assistance from Deputy Rickman at 10:00 p.m. on December 22, 2007. He observed the defendant in the day room, wrapped in towels. He was concerned because "that usually means that the inmate is preparing to fight." Deputy Jones testified that there was no one else with the defendant in the day room, that no one went inside to assault him, and that, to his knowledge, no one had harmed the defendant. The defendant continued to refuse instructions to lockdown until he entered his cell, at which point the deputies instructed him to close the door. The defendant, however, exited his cell again, carrying two socks with two bars of soap inside each sock. Deputy Jones testified that inmates are allowed two bars of soap for hygiene purposes, and "[a]pparently [the defendant] had been hoarding the other soap." When the defendant came out of his cell with the socks and soap, Deputy Jones went to the control room to retrieve a plexiglass shield that would cover most of a person's body because he had determined that the situation could result in bodily harm to the deputies. The deputies had chemical spray as an offensive weapon, but they did not have batons or other weapons.

Deputy Jones was the first officer to enter the day room, behind the shield. They tried to use chemical spray to subdue the defendant, but the spray was ineffective. As Deputy Jones approached the defendant, he repeatedly struck the shield with the soap-laden socks. The deputies backed the defendant into the back of the day room, and the defendant then swung a sock at Deputy Jones, striking him in the forehead. The defendant also struck Sergeant Lavenue, breaking the sergeant's glasses. Deputy Jones testified that they tried to restrain the defendant with handcuffs, but the defendant continued fighting. Deputy Jones fell to the ground, and the defendant fell on top of him. The defendant repeatedly struck Deputy Jones in the ribs with his fists. Eventually, the deputies got the defendant onto the ground, handcuffed him, and placed him in his cell. They secured the cell and removed the restraints through the flap in the door. Deputy Jones testified that the deputies did not use any weapons other than the shield and the chemical spray. Deputy Jones said that he had seen "the soap in the sock" before and considered it a dangerous weapon because of the force with which someone could swing the sock. Deputy Jones believed that the weapon could break bones or even kill someone. He testified that the defendant swung the socks with enough force to push the shield back each time he struck. Deputy Jones demonstrated for the court how the defendant used the socks.

On cross-examination, Deputy Jones testified that he did not consider the defendant's behavior on the night of December 22, 2007, to be normal, but he and the other deputies did

not discuss inmates' mental health issues because it was not in their job description to determine if someone is mentally fit. He did not refer the defendant to the medical department that night because the defendant was not injured. Deputy Jones was unaware of any grievances filed by the defendant against him. The defendant had been in altercations with deputies in the past.

On re-direct examination, Deputy Jones said that the defendant was in protective custody because of altercations with other inmates. The defendant "[gave them] more disciplinary problems than most." Deputy Jones identified a picture of himself, taken on December 22, 2007, which showed that the bridge of his nose was bruised following the encounter with the defendant.

Sergeant Owen Taylor Lavenue, of the Madison County Sheriff's Department, corroborated Deputy Rickman and Deputy Jones's testimony. He identified a picture showing his glasses that the defendant broke and the bruising on his face.

On cross-examination, Sergeant Lavenue testified that he was the shift supervisor that night. He knew that the defendant had been given his meals that day, but he did not know whether the defendant ate his meals or the last time that the defendant showered. According to Sergeant Lavenue, inmates knew that they first had to lockdown before he would discuss "gripes" with them. Sergeant Lavenue said "[the defendant] had been there long enough to know the protocol." He did not know the defendant's mental state that day. He believed the defendant was not acting rationally. Sergeant Lavenue said, "[The defendant is] rational when he wants to be. He's aggressive when he doesn't want to be." Sergeant Lavenue did not know when the defendant last saw a mental health provider, nor did he know whether the defendant had received his medication that day.

On re-direct examination, Sergeant Lavenue said the deputies cannot force an inmate to eat, take showers, or take their medications. On re-cross-examination, he said he would inform the nursing staff if an inmate refused to eat or take medications, and their records would reveal that situation.

The defendant testified that he had asked to talk to the sergeant, but the deputies would not let him. He wanted to discuss with the sergeant about the deputies not doing their jobs. He said that Deputy Jones had assaulted him before, resulting in a scar on his face, so he got the socks with soap from his cell. The defendant said that inmates had jumped him twice. Once the other inmates hit him with a metal showerhead, and he had to go to the hospital for stitches. He said the deputies "antagonize[d]" him by calling him names and "used to mess the phone up on purpose." He believed the deputies sprayed pepper spray and spit on his food. The defendant had previously filed a grievance against Deputy Jones, but he did not get a response to the grievance.

The defendant testified that he did not swing the socks when the deputies came into the day room. He said Deputy Jones held the shield with one hand and punched him in the face with the other. The defendant "took a swing at him but [he] missed." He then dropped the soap and pushed Deputy Jones. When Deputy Jones fell to the ground, he jumped on him. Another deputy stepped on his hand at that point. The defendant said he was wrapped in towels for his protection. He denied assaulting the deputies and said that he was protecting himself. He testified that he did not follow instructions to lockdown because he did not see that the sergeant was with the deputies. The defendant said a psychiatrist prescribed medication for him, but the medicine "made things worse," so he stopped taking it.

Following the close of proof and deliberations, the jury returned their verdicts, finding the defendant guilty of possession of contraband in a penal institution, two counts of misdemeanor assault, and vandalism under $500. The trial court sentenced him as a Range I standard offender to six years in the Tennessee Department of Correction for possession of contraband and eleven months, twenty-nine days in the county jail for each of the misdemeanor convictions. The court ordered the defendant to serve the sentences consecutively to each other and to case number 07-372. The court denied the defendant's motion for new trial, and he timely perfected this appeal.

**Analysis**

On appeal, the defendant challenges the court's jury instructions. Specifically, he argues that it was error for the trial court to respond to the jury's question about the defendant's mental capability by instructing them to only consider the defendant's mental state with respect to "intentional or knowing" conduct and not to instruct them to consider his mental state with respect to his self-defense claim. The state responds that the court sufficiently instructed the jury in the jury charge with regard to the defendant's mental state and his self-defense claim. We agree with the state.

Under the United States and Tennessee Constitutions, a defendant has a right to trial by jury. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). A defendant also has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. *Id.* In evaluating claims of error in jury instructions, courts must remember that "'[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning.'" *State v. Vann*, 976 S.W.2d 93, 101 (quoting *Boyde v. California*, 494 U.S. 370, 380-381 (1990)). Therefore, we review each jury charge to determine if it fairly defined the legal issues involved and did not mislead the jury. *See State v. Hall*, 958 S.W.2d 679, 696 (Tenn. 1997). When the trial court's instructions to the jury correctly, fully, and fairly state the applicable law, it is not error to refuse to give a special requested instruction. *State v. Inlow*, 52 S.W.3d 101, 107 (Tenn.

Crim. App. 2000); *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). This court must review the entire jury charge; we can find error only if, when read as a whole, the charge fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). The trial court has the authority to give supplemental instructions in response to a question by the jury. *State v. Moore*, 751 S.W.2d 464, 467; *see also State v. Jim Gerhardt*, No. W2006-02589-CCA-R3-CD, 2009 WL 160930, at *13 (Tenn. Crim. App. at Jackson, Jan. 23, 2009). As a mixed question of law and fact, our standard of review for questions concerning the propriety of jury instructions is *de novo* with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

During jury deliberations, the jury asked the trial judge, "What is the mental capability of the Defendant? Was medication used for his mental state or to control his behavior?" The trial judge responded, "You should not concern yourselves with the Defendant's mental capability except as set forth in the jury instructions with respect to intentional and knowing conduct." The defense attorney objected to the instruction and asked that the judge include an instruction for the jury to consider the defendant's mental state in regard to the reasonableness of his self-defense claim. The judge overruled the objection, concluding that the requested instruction was included in the jury charge.

The defendant testified that he acted to protect himself from the deputies; therefore, his testimony fairly raised the issue of self-defense. The trial judge gave an approximately four-page instruction on self-defense in the jury charge, and he defined both intentional and knowing conduct. Concerning the reasonableness of the self-defense claim, the jury charge reads in part:

> Included in the Defendant's plea of not guilty is his plea of self-defense.
>
> If a Defendant was not engaged in unlawful activity and was in a place where he or she had a right to be, he or she would have no duty to retreat before threatening or using force against the alleged victim when and to the degree the Defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use or attempted use of unlawful force.
>
> If a Defendant was not engaged in unlawful activity and was in a place where he or she had a right to be, he or she would also have no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury if the Defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed

to be real at the time, and the belief of danger was founded upon reasonable grounds.

In determining whether the Defendant's use of force in defending himself was reasonable you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it.

Factors to consider in deciding whether there were reasonable grounds for the Defendant to fear death or serious bodily injury from the alleged victims include but are not limited to any previous threats of the alleged victims made known to the Defendant; the character of the alleged victims for violence, when known to the Defendant; the animosity of the alleged victims for the Defendant, as revealed to the Defendant by the previous acts and words of the alleged victims; and the manner in which the parties were armed and their relative strengths and sizes.

In reviewing the jury charge as a whole, we conclude that the trial court fully instructed the jury regarding the defendant's reasonable belief that he used necessary force to protect himself. *See* Tenn. Code. Ann. § 39-11-611(b). Therefore, there was no need for the judge to supplement the charge with an additional instruction on reasonableness, and the trial court did not err by refusing defense counsel's request to include such an instruction in the court's response to the jury's question. *See Inlow*, 52 S.W.3d at 107. The defendant is without relief in this matter.

## Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE