IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 19, 2019 Session

**ROY ANTHONY HALEY v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Bedford County**
**No. 18180    F. Lee Russell, Judge**

_____

**No. M2017-00976-CCA-R3-PC**

_____

The Petitioner, Roy Anthony Haley, was convicted of theft of property valued at $10,000 or more but less than $60,000, and he was sentenced as a Range III, persistent offender to fifteen years in confinement. Subsequently, he filed a petition for post-conviction relief, alleging ineffective assistance of counsel. The post-conviction court denied the petition. The Petitioner appeals, contending that he was denied due process at his post-conviction hearing because he was not afforded the opportunity to call critical witnesses and because the post-conviction court was so biased and prejudiced toward him as to render the hearing unfair. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Michael Meise, Dickson, Tennessee (on appeal), and M. Wesley Hall, IV, Unionville, Tennessee (at hearing), for the Appellant, Roy Anthony Haley.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Robert James Carter, District Attorney General; and Michael David Randles, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On direct appeal, this court summarized the proof adduced at trial as follows:

Wallace L. Chambers, Jr., a military veteran, testified that he and his wife, Ava Alito Hale Chambers, were both retired. Mr. Chambers stated that his wife suffered from Alzheimer's disease and was bedridden, which necessitated his hiring a fulltime caregiver, Laketia Grizzle, in January 2012. In April 2012, Ms. Grizzle married the [Petitioner] and changed her name to Laketia Haley. Mr. Chambers occasionally hired the [Petitioner] to perform odd jobs on his property, which Mr. Chambers classified as "exclusively outside work." Mr. Chambers testified that the [Petitioner] "had no reason to be in the house except to come in and eat lunch, maybe."

Mr. Chambers owned an extensive coin collection, weighing approximately 72 pounds and worth between $65,000 and $70,000, which he had inherited from his father and had added to over the years. Mr. Chambers had planned to pass the collection on to his grandchildren upon his death. Mr. Chambers stored the collection inside a safe which was hidden in the back of a closet in his living room. When questioned about access to the safe, Mr. Chambers stated that he trusted Ms. Haley and that she had opportunities to access the safe unseen by either of her employers. The [Petitioner] also would have had access to the safe when he was inside Mr. Chambers' residence. Mr. Chambers denied that either Ms. Haley or the [Petitioner] had permission to remove any of the coins from his home.

On July 22, 2012, Mr. Chambers received a telephone call from Vickie Bly, a person he had never met or heard of prior to receiving the call. Following the call from Ms. Bly, Mr. Chambers checked the safe and discovered that his entire coin collection was missing. Mr. Chambers immediately contacted the sheriff's department and filed a report. According to Mr. Chambers, the sheriff's department interviewed Ms. Haley, and, following that interview, she and the [Petitioner] fled. The sheriff's department recovered "less than half" of the coins that were stolen.

Laketia Elaine Haley testified that, while she was working for Mr. and Mrs. Chambers, she and the [Petitioner] were both addicted to painkillers, and the [Petitioner] did not have steady employment. In March, Ms. Haley discovered

- 2 -

the coin collection inside the Chambers's safe, and she began by stealing "10 to 15 rolls" of coins. She and the [Petitioner] later stole "the majority" of what remained in the collection. Ms. Haley and the [Petitioner] took the coins to local pawn shops and sold them, using the majority of the proceeds to purchase painkillers. When the sheriff's department first contacted Ms. Haley about the stolen coins, Ms. Haley denied any involvement, and when the sheriff's department contacted her to arrange a follow-up interview, Ms. Haley and the [Petitioner] fled to Florida. Ms. Haley and the [Petitioner] were eventually arrested in Florida and returned to Tennessee. Ms. Haley admitted that she had recently pleaded guilty to theft of property valued at $10,000 or more but less than $60,000 and that she was awaiting sentencing.

Both Ron Arnold and Michael Bass testified that, between March 5 and July 20, 2012, the [Petitioner] and Ms. Haley patronized their respective pawn shops and sold numerous coins; records of each of those transactions were introduced into evidence by the State. Following the testimony of Mr. Bass, the parties stipulated that the value of the coins at issue was greater than $10,000 but less than $60,000.

Detective Scott Jones with the Bedford County Sheriff's Department testified that when he initially interviewed Ms. Haley, she had denied all involvement in the theft of the coins. After Ms. Haley was arrested in Florida and returned to Tennessee, Detective Jones again interviewed her, and on that occasion, she admitted that she had stolen the coins and that she and the [Petitioner] had sold the coins to "fund their drug addictions."

State v. Roy Anthony Haley, No. M2013-02756-CCA-R3-CD, 2014 WL 5698076, at *1-2 (Tenn. Crim. App. at Nashville, Nov. 5, 2014).

At the conclusion of the proof, the jury convicted the Petitioner of theft of property valued at $10,000 or more but less than $60,000. Id. The trial court sentenced the Petitioner as a Range III, persistent offender to fifteen years with release eligibility after serving forty-five percent of the sentence in confinement. Id. On appeal, the Petitioner challenged the length of the sentence imposed. Id. This court affirmed the Petitioner's sentence but remanded for correction of the judgment to reflect that the

sentence was to be served consecutively to a previously imposed sentence as ordered by the trial court at the sentencing hearing. Id. at *5.

Thereafter, on November 4, 2015, the Petitioner filed a pro se petition for post-conviction relief that included multiple allegations of ineffective assistance by the attorneys who represented him at his preliminary hearing, trial, sentencing hearing, and on appeal. The Petitioner also maintained that the indictment against him was unconstitutional, and he made various allegations of judicial and prosecutorial misconduct.

The Petitioner's first court appearance on his post-conviction petition was on November 20, 2015. During the proceeding, the post-conviction court stated it had appointed an attorney to represent the Petitioner that morning. The court explained that post-conviction counsel would not be in the courtroom to speak with the Petitioner until after the lunch break. The court suggested that rather than having the guards remain with the Petitioner that afternoon, the Petitioner would be taken back to jail, post-conviction counsel would speak with the Petitioner while he was in jail, the Petitioner would be transported back to court in December, and the post-conviction hearing would be held in February.

The Petitioner told the post-conviction court that it was putting him at a disadvantage by "slow walking [him] with a lawyer." The post-conviction court assured the Petitioner, "I'm not slow walking you. You know what, you're going to sit right here until [post-conviction counsel] gets here this afternoon." The Petitioner replied, "Whatever." The post-conviction court said, "And you can explain to the guards why they have to sit here an extra hour."

The Petitioner exited the courtroom, and the post-conviction court addressed other matters. When the Petitioner and post-conviction counsel entered the courtroom later, the post-conviction court explained to post-conviction counsel that he "better visit with [the Petitioner]. He, he has suggested that I am dragging my feet, so I'm telling you, I'm ready tomorrow, morning or afternoon; Christmas Day, morning or afternoon; whenever the rest of you can be ready, I'll stop dragging my feet and have the hearing."

Post-conviction counsel responded that the Petitioner wanted the post-conviction court to recuse itself "due to some allegations of judicial misconduct." The post-conviction court refused, noting that the Petitioner's alleged issues of misconduct were merely challenges to the court's rulings at trial. The post-conviction court asked the Petitioner to detail his allegations against the court, noting that "foot dragging" was the only thing the Petitioner had mentioned.

Regarding the recusal, the Petitioner maintained that he had asked to call Tyler Grizzle as a witness at the motion for new trial hearing and that the court conducted the hearing even though Grizzle was not present. The post-conviction court explained that the parties, not the court, determined who would testify at the hearing and that the clerk's office, not the court, was responsible for issuing subpoenas.

The Petitioner next complained that the court had granted funds for the defense to hire an appraiser but that the appraisal was not introduced at trial even though the Petitioner thought it should have been. The post-conviction court explained that the Petitioner and his trial counsel, not the court, were responsible for deciding the evidence that was to be presented at trial. The post-conviction court asked if the Petitioner had any other complaints about the court. The Petitioner responded, "I don't know. I guess that's it." The post-conviction court held that the Petitioner had not presented any grounds for recusal.

Regarding the scheduling of the hearing, the post-conviction court explained to the Petitioner that the court and the State had "been right in the middle of this for a long time," but post-conviction counsel was newly appointed and would be at a disadvantage if he were not given adequate time to prepare. The Petitioner agreed that post-conviction counsel needed to "get familiar with the case." The post-conviction court advised post-conviction counsel, "It's not the average case. You may need longer [to prepare]. But I'm not telling you that to drag my feet. As I say, if you think you can be ready tomorrow, let's go. But, but you can't. You've got to look into this." Post-conviction counsel and the post-conviction court stated that they thought the Petitioner wanted to "fast-track[]" the hearing, but the Petitioner interjected, "No, I don't desire that." Post-conviction counsel said that he would be prepared for the hearing in February.

At the February 4, 2016 hearing, the post-conviction court announced that because of a lockdown at the facility in which the Petitioner was housed, the Petitioner had not been transported to court. The prosecutor advised the court that the Petitioner had subpoenaed the victim, which was "unusual." After the subpoena was served, the victim's son, who lived in Hopkinsville, Kentucky, contacted the prosecutor by telephone. The victim's son explained that the victim was "of advanced age," did not leave home often, had mobility problems, and "sometimes his mind is not all there." The victim's son asked the prosecutor why the subpoena had been issued, but the prosecutor was unable to offer an explanation. The prosecutor said that if the victim's son had lived nearby, he would have been asked to come to court and explain the situation. The prosecutor suggested that the post-conviction court and the parties could call the victim's son and determine the problems with having the victim testify.

The post-conviction court asked post-conviction counsel to discuss the issue with the Petitioner and determine his reasons for subpoenaing the victim. The post-conviction

court suggested that the parties try to avoid calling the victim by stipulating his testimony or by obtaining a telephone statement "if the son thinks he's having a good day." The post-conviction court surmised that the victim's testimony would not "be any help or, or harm to the cause, either one." Post-conviction counsel stated, "As far, as far as the former, yes, I will try to contact him. And the latter, yes, I also agree."

At a hearing held on February 19, 2016, the post-conviction court noted that initially, the Petitioner had not raised any complaints about appellate counsel and asked if the Petitioner needed appellate counsel to testify at the post-conviction hearing. The post-conviction court explained that due to his wife's illness, appellate counsel could not be in court that day, and he might not be available for several weeks. The Petitioner responded that he wanted appellate counsel to be present because he had issues with the way appellate counsel represented him at the sentencing hearing, the motion for new trial, and on appeal. The post-conviction court warned the Petitioner that requiring appellate counsel to be present for the hearing could delay the proceedings because the court would not "make him leave his very ill wife's bedside to do this." The Petitioner expressed his sympathies for appellate counsel but repeated that he wanted him present for the hearing.

At that time, the post-conviction court asked appellate counsel's employer, who was in the courtroom, for an update on appellate counsel's situation. Appellate counsel's employer said that appellate counsel's wife could be released from the hospital at "mid-March, at best" but that "if things don't progress positively, it could be much, much later than that." The post-conviction court suggested that the post-conviction hearing be continued until April 15. The post-conviction court advised the Petitioner that if, at the time of the hearing, appellate counsel was "still with his, his wife, I'm not going to require him to be here, which would mean we'd need to put it off again, okay?" The Petitioner agreed.

At the April 15, 2016 hearing, post-conviction counsel called the Petitioner to testify. Immediately before the Petitioner began to testify, post-conviction counsel announced that he would pursue the "most salient issues" from the Petitioner's pro se post-conviction petition and that afterward, he would give the Petitioner the opportunity to raise any additional issues he wanted addressed by the post-conviction court. The Petitioner gave his assent.

The Petitioner testified that prior to trial, trial counsel had an expert appraise the coins stolen from the victim. The Petitioner did not receive a copy of the appraisal until after his conviction. The appraised value of the stolen coins was $9,144. The Petitioner asserted that trial counsel should have introduced the appraisal to show that the value was less than $10,000, which would have reduced the Petitioner's conviction from a Class C felony to a Class D felony.

The Petitioner said that "the dollar value of the coins would, of course, have made a difference." He noted that the victim had testified at trial that the coins weighed approximately seventy-eight pounds and that the co-defendant said she had carried the coins out of the victim's house in a tote bag. The Petitioner opined that removing the coins in one trip was impossible.

The Petitioner maintained that trial counsel failed to investigate his case prior to trial. He noted that trial counsel never interviewed the Petitioner's ex-girlfriend, Vicky Bly, who had told the victim that the coins were stolen by the co-defendant. The Petitioner did not think trial counsel interviewed the co-defendant's son, Grizzle.

The Petitioner acknowledged that the co-defendant testified at trial that the Petitioner knew the coins were stolen. He contended, however, that "[s]he had everything to gain" by testifying against him, noting that she was granted probation and moved in with the victim. The Petitioner maintained that his co-defendant stole the coins from the victim and that she did not tell the Petitioner the coins were stolen "until after the final sale was done." The Petitioner contended that the co-defendant also gave some of the stolen coins to Grizzle. The Petitioner wanted appellate counsel to call Grizzle to testify at the hearing on the motion for new trial because "he would have told the same thing as I did, that he did not know that they were stolen. She was telling every one of us the same story, that she had inherited those coins."

The Petitioner said that appellate counsel failed to include all of the issues the Petitioner wanted in the motion for new trial, which limited his success on appeal. The Petitioner said that appellate counsel could have demonstrated at the motion for new trial that the Petitioner did not know the coins were stolen and could have introduced new evidence regarding the value of the coins, namely the expert's appraisal.

The Petitioner said that at the hearing on the motion for new trial, appellate counsel "tried to withdraw, because we couldn't agree," but the trial court would not allow appellate counsel to withdraw. Appellate counsel then asked for a continuance, which the trial court denied. The Petitioner felt appellate counsel was "in the wrong. He didn't do what he should, but he tried in some ways."

Regarding the victim's absence at the hearing, post-conviction counsel asked the Petitioner, "You had made some commentary about the victim and his lack of presence today. Did you want to comment on that and what kind of testimony you feel you would have been able to . . . ." The State objected, arguing that it was irrelevant. The post-conviction court sought clarification, asking post-conviction counsel if the Petitioner was disappointed the victim was not present for the hearing. Post-conviction counsel responded, "That is what he brought forth to me and he wanted to comment on that. I was just reminding him." The post-conviction counsel sustained the State's objection.

The Petitioner said that "[t]he victim was writing letters to the co-defendant during the time that I was going to trial." He maintained that trial counsel subpoenaed the letters but did not submit them as evidence at trial. The Petitioner opined that the letters would have made a difference in the jury's verdict. The Petitioner conceded, however, that he "never saw [the letters], other than a brief second." The Petitioner asserted that the victim also visited the co-defendant in jail and that after she was convicted, "she move[d] back in with him and work[ed] for him again." The Petitioner opined, "It just seems to me like it was a big, big plot. But I think if the jurors would have seen those letters, he clearly coerced her into testifying." The Petitioner thought trial counsel should have "addressed that a little bit more at trial."

The Petitioner complained that appellate counsel "never even tried to find out if I was innocent or guilty in my, in my appeals. He just said that I got an excessive sentence."

The Petitioner said that he asked post-conviction counsel to have Grizzle testify at the post-conviction hearing and that post-conviction counsel said the court would not allow it.

On cross-examination, the Petitioner said that he was in custody prior to trial and that he never had any meetings or conversations with the appraiser. Accordingly, he did not know what the appraiser may have told trial counsel about his prospective testimony.

On redirect examination, the Petitioner said that because appellate counsel "did such a job on the rest of it," he wanted appellate counsel to withdraw from his case. Nevertheless, appellate counsel wrote a brief which the Appellant opined "was poorly, poorly put together." The post-conviction court asked if the Petitioner was referring to the appellate brief. The Petitioner responded, "That's what I'm talking about, yes. You don't agree with that, Your Honor?" The post-conviction court informed the Petitioner that he could not ask the court such questions. The Petitioner stated that he had requested that the trial court testify at the hearing but that the court refused. The post-conviction court asked if the parties had anything else to discuss, and the State and post-conviction counsel responded that they did not.

Trial counsel testified that the Petitioner was represented by another attorney in general sessions court; however, when the Petitioner was indicted for "theft over $60,000," a public defender was appointed to represent the Petitioner. Before the sentencing hearing, the Petitioner asked for trial counsel to be relieved, and appellate counsel was appointed to represent the Petitioner during sentencing, the motion for new trial, and the direct appeal.

Trial counsel recalled that after his appointment, he learned the victim had reported that a large number of coins had been stolen and that the victim estimated that the value of the coins was more than $60,000. Trial counsel doubted the accuracy of the victim's estimate and obtained funding from the trial court to hire an appraiser.

Trial counsel also spoke with the two pawnshop owners and learned that the Petitioner and his co-defendant came into their shops several times, separately and together, to sell the coins. Some of the coins were melted, and the silver was sold. The pawnshop owners estimated that the value of the melted coins was approximately $1,500 to $2,000. The defense's appraiser estimated that the value of the coins recovered by law enforcement was $9,100; however, the appraiser advised trial counsel "that coin appraisals were very subjective." Trial counsel was aware that the appraisal did not include the value of the melted coins or the coins that were not recovered by law enforcement. Trial counsel concluded that the appraisal would not be beneficial because the State could establish through the testimony of the pawnshop owners, the victim, and law enforcement the value of the coins that were never recovered. Accordingly, the State's proof easily established that the total value of the stolen coins was "well over $10,000."

On cross-examination, trial counsel said that the victim had asked the State to drop the charges against the co-defendant, who was the Petitioner's wife at the time of the offense. The victim wrote the co-defendant "letters about paying for her divorce, about her coming back – she'd been fired, she was in jail, about coming back to work and that sort of thing." Trial counsel said that he cross-examined the victim "about those issues, and [the victim] admitted it. [The co-defendant] admitted it." Trial counsel said that the allegation at trial was that the victim and the co-defendant had been having an affair; however, the victim denied the allegation.[1]

Trial counsel said that Grizzle was the co-defendant's son and that the Petitioner referred to the co-defendant as his wife. Trial counsel said that at trial, the co-defendant "was asked questions about, who did you tell and where did you tell the people that she obtained the coins from. Her answer was, I got them from my deceased father. I inherited them, in other words. She told her son she admitted to it." Trial counsel said that the co-defendant acknowledged she had reached an agreement with the State whereby she would receive probation in exchange for her testimony against the Petitioner. Trial counsel said that the co-defendant testified that she took the coins and that the Petitioner "knew where they came from and where she was getting them and pretty much did nothing to stop her. He was all for it. He was as much a party to it as

---

[1] At trial, the co-defendant was not questioned about an alleged affair with the victim.

she was, even though he didn't physically go inside to sell the coins." Trial counsel said that he made a strategic decision not to have Grizzle testify at trial.

At the conclusion of the hearing, the post-conviction court noted that the $9,100 appraisal "would have come awfully, awfully close to the $10,000" and that the appraisal might have supported the State's case instead of undermining it. Accordingly, the post-conviction court found that trial counsel made a strategic decision not to present the appraisal at trial and that the strategy was sound. As to the Petitioner's claim that counsel should have called Grizzle, the post-conviction court found that the Petitioner did not call Grizzle at the post-conviction hearing and had failed to establish what Grizzle's testimony at trial would have been. Therefore, the Petitioner had not shown counsel was deficient or that the Petitioner had been prejudiced.

On appeal, the Petitioner contends for the first time that he "was denied due process at his post-conviction evidentiary hearing; therefore, the [post-conviction] court erred in dismissing his petition for post-conviction relief." Specifically, the Petitioner contends that he "was not afforded the opportunity to call critical witnesses at his evidentiary hearing" and that the post-conviction court "was prejudicial toward [him], demonstrating such bias and hostility as to render the post-conviction hearing unfair."

## II. Analysis

We note that "[r]elief under [the Post-Conviction Procedure Act] shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. "'Due process is flexible and calls for such procedural protections as the particular situation demands.'" Seals v. State, 23 S.W.3d 272, 277 (Tenn. 2000) (quoting Phillips v. State Bd. of Regents, 863 S.W.2d 45, 50 (Tenn. 1993)). "The flexible nature of procedural due process requires an imprecise definition because due process embodies the concept of fundamental fairness." Id. "All that due process requires in the post-conviction setting is that the defendant have the opportunity to be heard at a meaningful time and in a meaningful manner." Stokes v. State, 146 S.W.3d 56, 61 (Tenn. 2004) (internal quotation marks and citations omitted). In a post-conviction proceeding, the requirement of a "'full and fair hearing'" is fulfilled when a "'petitioner is given the opportunity to present proof and argument on the petition for post-conviction relief.'" Brimmer v. State, 29 S.W.3d 497, 531 (Tenn. Crim. App. 1998) (House v. State, 911 S.W.2d 705, 714 (Tenn. 1995)). Moreover, the determination of whether the prospective evidence is relevant is left to the post-conviction court's discretion, which this court will not overturn without a showing of abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)).

Most, if not all, of the Petitioner's claims on appeal relate to his allegations that he was denied due process at the post-conviction hearing by the post-conviction court. Our supreme court has stated that "[a]ll that due process requires in the post-conviction setting is that the defendant have the opportunity to be heard at a meaningful time and in a meaningful manner." Stokes v. State, 146 S.W.3d 56, 61 (Tenn. 2004) (internal quotation marks and citations omitted). In order for a Petitioner to have a full and fair post-conviction hearing, he or she must be given only "the opportunity to present proof and argument on the petition for post-conviction relief." House, 911 S.W.2d at 714; see Tenn. Code Ann. § 40-30-106(h) ("A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence."). At the hearing, the "[p]roof upon the [P]etitioner's claim or claims for relief shall be limited to evidence of the allegations of fact in the petition." Tenn. Code Ann. § 40-30-110(c).

A criminal defendant's constitutional right to compulsory process to obtain witnesses in their favor is not unlimited and "extends to 'competent, material, and resident witnesses whose expected testimony will be admissible.'" William Darryn Busby v. State, No. M2012-00709-CCA-R3-PC, 2013 WL 5873276, at *8 (Tenn. Crim. App. at Nashville, Oct. 30, 2013) (quoting Bacon v. State, 385 S.W.2d 107, 109 (Tenn. 1964)); see Paul Graham Manning v. State, No. M2005-02876-CCA-R3-PC, 2007 WL 4116487, at *12 (Tenn. Crim. App, at Nashville, Nov. 13, 2007). It is within the court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the court's decision absent an abuse of discretion. Forbes, 918 S.W.2d at 449 (Tenn. Crim. App. 1995).

Although the Petitioner stated at earlier hearings that he wanted the victim and appellate counsel to be called as witnesses, the record does not reflect why they were not present at the post-conviction hearing. The Petitioner asks this court to presume that he was denied a full and fair hearing because the witnesses did not appear for the hearing. However, the record does not support this presumption.

Regarding the victim, we note that although the post-conviction court initially questioned how the victim's testimony could benefit the Petitioner's case, the court did not prevent the Petitioner from calling the victim. The post-conviction court merely asked the Petitioner to consider an alternate way of obtaining the victim's testimony, such as by affidavit or telephone conference, so that the victim, who was elderly and unwell, would not be required to come to court. The record does not reflect that the Petitioner pursued obtaining the victim's testimony by alternate means as suggested by the post-conviction court.

Although post-conviction counsel stated that the Petitioner was disappointed the victim was not present to testify, the record does not reflect the victim could have offered

any testimony that was relevant to the Petitioner's ineffective assistance of counsel claims. Notably, the Petitioner testified that in order to support the Petitioner's claim that the victim and the co-defendant had a relationship after her arrest, he wanted to question the victim about letters the victim wrote to the co-defendant. The Petitioner acknowledged that he "never saw [the letters], other than a brief second." The Petitioner did not introduce any letters at the post-conviction hearing. Trial counsel testified that he read the letters and, while he did not introduce them at trial, he used them to cross-examine the victim. We have reviewed the direct appeal transcript and note that trial counsel cross-examined the victim extensively regarding the letters and his relationship with the co-defendant. The victim acknowledged he wrote letters to the co-defendant after she was arrested but maintained that he offered only to pay for her divorce from the Petitioner so she could end the abusive relationship. The victim also testified that while he had been fond of the co-defendant, after the offense, he no longer trusted her and would not allow her back in his home. The Petitioner is not entitled to relief. See Bruce S. Rishton v. State, No. E2010-02050-CCA-R3-PC, 2012 WL 1825704, at *19 (Tenn. Crim. App. May 21, 2012); George T. Haynie, Jr. v. State, No. M2009-01167-CCA-R3-PC, 2010 WL 3609162, at *7 (Tenn. Crim. App. at Nashville, Sept. 16, 2010); Manning, No. M2005-02876-CCA-R3-PC, 2007 WL 4116487, at *12.

Regarding appellate counsel, the post-conviction court expressed its willingness to postpone the hearing until appellate counsel could be present. The court cautioned the Petitioner that waiting for appellate counsel would delay the proceedings. The Petitioner did not raise an objection to continuing without appellate counsel. Indeed, during his testimony, the only witness the Petitioner mentioned that he wanted to testify at the post-conviction hearing was Grizzle. Accordingly, we conclude that the Petitioner was not deprived of his right to a full and fair post-conviction hearing.

The Petitioner also contends that the post-conviction court's tone and comments throughout the proceedings reflected that the court was prejudiced and biased against him. "The right to a fair trial before an impartial tribunal is a fundamental constitutional right." State v. Austin, 87 S.W.3d 447, 470 (Tenn. 2002). In particular, "[a] trial before a biased or prejudiced judge is a denial of due process." State v. Rimmer, 250 S.W.3d 12, 37 (Tenn. 2008) (citing Wilson v. Wilson, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998)). Tennessee Supreme Court Rule 10B section 1.01 "expressly provides that any party seeking disqualification or recusal of a trial judge 'shall do so by a timely filed written motion.'" Cain-Swope v. Swope, 523 S.W.3d 79, 88 (Tenn. Ct. App. 2016). Although counsel noted the Petitioner's dissatisfaction with the court at the November 20, 2015 hearing, the Petitioner never filed a written motion for recusal. It is well-established that "recusal motions must be filed promptly after the facts forming the basis for the motion become known, and the failure to assert them in a timely manner results in a waiver of a party's right to question a judge's impartiality." Duke v. Duke, 398 S.W.3d 665, 670 (Tenn. Ct. App. 2012) (internal quotation marks and citation omitted). We

conclude that the Petitioner waived the issue by failing to timely file a motion for recusal. State v. Antonio McMiller, No. E2015-01597-CCA-R3-CD, 2016 WL 3947878, at *9 (Tenn. Crim. App. at Knoxville, July 18, 2016). This issue is without merit.

### III. Conclusion

Finding no error, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE